TABER (BRUNENT v.). See Case No. 2,054.

TABER (HUNNEWELL v.). See Case No. 6,880.

## Case No. 13,720.

### TABER et al. v. JENNY et al.

[1 Spr. 315;[1] 19 Law Rep. 27.]

District Court. D. Massachusetts. Jan. 10, 1856.

PLEADING IN ADMIRALTY—REPLICATION—AWARD—WHALE FISHERY—TORTIOUS TAKING OF ANCHORED WHALE—DAMAGES—PROPERTY IN OIL AND BONE.

1. A replication merely denying the truth of the answer, is not required in this district; but where the libellant relies on new matter, in avoidance, he should put it on the record by a supplemental libel, to which the respondents should answer.

[Cited in The Edwin Baxter, 32 Fed. 296.]

2. When a whale has been killed, and is anchored and left with marks of appropriation, it is the property of the captors.

[Cited in Maltby v. Steam Derrick-Boat, Case No. 9,000; Ghen v. Rich, 8 Fed. 160.]

3. Where such a whale, still anchored, is afterwards found by another ship, there is no usage, or principle of law, by which the property of the original captors is divested, even though the whale may have dragged from its first anchorage.

[Cited in Ghen v. Rich, 8 Fed. 160; Simpson v. The Ceres, Case No. 12,881; Cope v. Vallette Dry-Dock Co., 16 Fed. 926.]

4. Where two vessels are under a contract of mate-ship, there is no such joint property in a whale taken by one of them, as requires the owners of both to join in an action for its tortious conversion.

5. An award, where one of the arbitrators has prejudged the cause, will be set aside.

[Cited in Paddock v. Commercial Ins. Co., 104 Mass. 531. Questioned in The Union, 20 Fed. 541.]

6. An umpire must hear the parties.

[Cited in Day v. Hammond, 57 N. Y. 486; Ingraham v. Whitmore, 75 Ill. 31.]

[1] [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

7. The measure of damages for the tortious taking of a whale, is to be full indemnity to the libellants for all they have lost by the taking, and no more.

[Cited in Bourne v. Ashley, Case No. 1,699; The Ontario, Id. 10,543; Swift v. Brownell, Id. 13,695; Guibert v. British Ship George Bell, 3 Fed. 585.]

8. The report of an assessor will not be disturbed, unless it be shown that he is wrong.

9. If substantial doubts exist, as to any of the elements of damage, they must operate against the wrong-doer.

10. A seaman, in the whale fishery, has no property in the oil or bone taken; and if this is wrongfully taken away by others, it is the right and duty of the owners to pursue the proper remedy.

[Cited in Lewis v. Chadbourne, 54 Me. 485.]

11. In such suit, no deduction is to be made, because some of the seamen have released their claim to the owners.

12. Nor because the wrong-doer has bestowed labor in securing and transporting the property, where that could have been done, without cost, by the owners.

13. Nor for some uncertainty, whether the owner could have found and secured the property.

This was a libel in admiralty, brought by the owners of the ship Hillman, of New Bedford, against the owners of the ship Zone, of Fairhaven, for damages by the alleged wrongful taking of a whale. The facts sufficiently appear in the opinion of the court.

The respondents, in their answer, in addition to other grounds of defence, set up an award previous to the filing of the libel. The libellants admitted the fact of the award, but contended that it was invalid; first, because one of the referees had formed and expressed an opinion against them, before his appointment; and second, because the umpire appointed upon the disagreement of the original referees, had decided the case merely from the statements of the referees.

To this latter point, the libellants cited Russ. Arb. 230, 231; Falconer v. Montgomery, 4 Dall. [4 U. S.] 233; Passmore v. Pettit, Id. 271; and Salkeld v. Slater, 12 Adol. & E. 767. As to the question of property, they relied on the principles stated in Sandars' Justinian, 181, 182, and Vinnius' Com. lib. 2, tit. 1, §§ 13-16.

T. D. Eliot and R. C. Pitman, for libellants.

L. F. Brigham, for respondents.

SPRAGUE, District Judge. The first question is one of practice: the only pleadings are the libel and answer. According to the practice in this district, a replication, merely denying the truth of the answer, is not necessary; the allegations of the answer are deemed to be in issue, without such formal denial. The answer here sets up an award of referees, as a bar to the libel; the libellants not denying that such an award was made, insist that it was not binding, for two reasons; first, that one of the referees had prejudged the cause; second, that the award was made by an umpire, without hearing the parties. This is new matter, in avoidance of the allegations of the answer, and should have been put on the record. This is sometimes done by a replication; but the more regular mode is by a supplemental libel, to which there should be an answer by the respondents. See note to Gladding v. Constant [Case No. 5,468]. The parties having come prepared to litigate these, as well as other points in controversy, and having engaged that a supplemental libel and answer shall be filed, so that all the issues shall appear upon the record, I proceeded at their request, to hear the cause, and will now state the conclusions at which I have arrived upon the merits.

This is a libel to recover the value of a whale. In the summer of 1852, the ship Hillman, of New Bedford, and the ship Zone, of Fairhaven, were whaling in the Ochotsk Sea. On the morning of the 23d of July, one of the boats of the Hillman pursued and killed a whale, but being alone, and the ship being at a distance, and obscured by a fog, the boat was unable to take the whale to the ship, and for the purpose of securing it, anchored it in fifteen fathoms of water, with an anchor weighing about sixty pounds, and a double tow-line with about thirty-seven fathoms scope, and a waif was fixed upon it. This waif was a staff, about eight feet long, with a flag at its head. After the whale was anchored, the boat lay by it nearly an hour to ascertain that it did not drift; the boat then went to the shore, which was not many miles distant. A few hours after the whale had been thus left by the Hillman's boat, a boat belonging to the Zone, with her captain on board, came across the whale. The captain took down the waif, and then went to his own ship, which was quite near; he there ordered his mate to get into the boat, go the whale, and bring it to the ship. This was done. When the mate reached the whale, he found the tow-line and anchor attached to it, and they were both taken into his boat. The whale having been taken alongside the Zone, the crew of that vessel proceeded to cut it in, that is, to strip off the blubber and take it on board. In doing this they found two irons with the initials H. N. B., which clearly indicated that they had belonged to the Hillman, of New Bedford. These irons were taken on board the Zone, as were also the anchor and rope attached to it. The irons were left on deck, the anchor was put below. The Zone, while cutting in the whale, stood out from the shore, but on the day following, while boiling down, stood in. The Hillman's boat having, after leaving the whale, returned to the ship, and obtained the assistance of other boats, went in search of the whale, but could not find it. This was on the morning of the 24th. During that day the mate of the Hillman seeing the Zone boiling down, went on board of her and ascertained that she had taken the whale. The irons were lying upon

her deck, and he took them away. But he did not see or hear anything of the anchor and tow-line. The anchor was thrown overboard by the captain of the Zone, but at what time does not appear, except that it was before the 26th. The excuse given by him for this, was violent and abusive language in his own cabin, by Captain Bennett. That such language was used, is in proof. But that cannot justify the act of throwing the anchor overboard. On the 25th, Captain Cook, of the Hillman, and Captain Bennett, of the whale ship Massachusetts, went on board of the Zone and demanded of Captain Parker, her master, the bone and oil of the whale, which were refused. They were subsequently brought to Fairhaven, and taken and sold by the respondents. A demand for the proceeds was made upon them by the libellants, and refused.

When the whale had been killed and taken possession of by the boat of the Hillman, it became the property of the owners of that ship, and all was done which was then practicable, in order to secure it. They left it anchored with unequivocal marks of appropriation.

It having thus become the absolute property of the Hillman, was that ownership ever lost? It is contended that it was. First, by the usage peculiar to the whale fishery; or secondly, by the principles of law applicable to the facts of this case. The usage proved, is, that when a whale is found adrift on the ocean, the finding ship may appropriate it to her own use, if those who killed it do not appear and claim it before it is cut in. But, from the evidence, it does not appear that this whale was found adrift. On the contrary, I am satisfied that it was anchored when taken by the boat of the Zone. (The judge here examined the evidence.) Whether it was found in the place where it had been left by the captors, or had dragged the anchor, and if it had dragged, how far, is left in some uncertainty. I do not think it is shown to have dragged, certainly not to any considerable distance, and if it had, there is no proof of usage embracing such a case.

2. By the general principles of law, when property is separated from the owner, at sea, by force of the elements, or even by abandonment from necessity, the person who finds it has not a right to convert it to his own use, and cannot thereby divest the right of the original owner. The finder, in such case, has only the right of a salvor, and must conduct in good faith as such. If he embezzles the property, or wrongfully converts it to his own use, he may thereby forfeit his claim to salvage. In this case, the whale was not derelict, it had not been abandoned by the owner, but had been left with the intention to return, and the captor did in fact return as soon as practicable, and in less than twenty-four hours. Whether the whale, when found by the crew of the Zone, was in a condition of peril so as to be the

subject of salvage service, need not now be considered, as that question is not before the court. It is not presented by the pleadings, nor by the propositions, or arguments on either side. Besides this, the conduct of the captain of the Zone was not that of a salvor, and was such as would preclude him from now assuming that character. A ship or merchandize found upon the ocean is still the property of the original owner, however distant he may be, and even although he believes it to be absolutely lost. It may, in such case, be subjected to a lien for salvage, but still the property, subject to such lien, is in the owner, and when such lien is displaced, the ownership is absolute and unincumbered. If such be the law with respect to property found derelict and drifting upon the ocean, for still stronger reasons must the right of the owner remain in full force to property which he has anchored and left only temporarily, soon to return and repossess it. That this would be so as to a vessel or boat so anchored and left, no one would doubt. But the same principle applies to this whale. By capture, killing and possession, it had become the absolute property of the libellants, and the anchor, waif and irons, were unequivocal proofs, not only that it had been killed and appropriated, but of the intention of the captors to reclaim and repossess it. It is in proof that the appearance of the whale was such, as to show to the finders that it could have been killed only a short time, not exceeding twelve hours. A whale not being the product of human care or labor, does not, of itself, purport to be property, and what would have been the right of the finders, if the captors had abandoned it without any marks of appropriation, need not now be considered. One other circumstance has been adverted to by the counsel for the respondents, as in favor of the right of the Zone. It is that the ships Massachusetts and Hillman were under a contract of mate-ship, and that on the morning of the day upon which Captain Parker found this whale, he had been on board of the Massachusetts, and was told by her captain that they had seen no whales for three days, and that Captain Parker was thereby led to the belief that this whale could not belong to either of those ships, and that there were no others near; but the captain of the Hillman was not present at that conversation, and his right is not to be impaired thereby.

It is objected, that the owners of the Massachusetts ought to have joined in this libel, because that vessel was under a contract of mate-ship with the Hillman; but it appears that such contract did not make the whale, when captured, the joint property of the two vessels, but would only give a right to the vessel which at the end of the season should have taken the lesser quantity of oil, to claim of the other one half of the excess, so as to make both equal. It is also insisted by the respondents, that this claim is barred by an

award of referees. It appears, that the matter in controversy was verbally submitted to two persons as referees, with power, if they should not agree, to appoint an umpire.

It further appears, that the referee, who was named by the respondents, had previously formed and expressed an opinion in their favor; and that this was known to their captain, who aided in selecting him. The two referees heard the parties, who introduced the two captains and other persons as witnesses. Not being able to agree, they appointed an umpire, who did not hear the parties, or any of their evidence, but formed his opinion upon the statements of the two referees. And thereupon, an award was made in writing and delivered to the parties, but which the libellants refused to abide by. That award was not binding. The libellants had no knowledge that one of the referees had formed and expressed an opinion adverse to their right, and they never agreed that an umpire should make a decision, without hearing the parties or any of their witnesses. This would have been necessary, even if both the referees had been unexceptionable, but it was peculiarly important that the umpire should not depend merely upon the statements of the two referees, when one of them had prejudged the case. The libellants are entitled to recover.

As to the measure of damages. The libellants claim the whole amount for which the oil and bone sold at Fairhaven. But this is not the measure. They should recover a full indemnity, but no more. they are to have all that they have lost by the taking of the whale from them in the Ochotsk Sea, on the 23d of July, 1852. The case will be sent to an assessor, to ascertain and report the facts necessary to be known, before the court can determine the amount.

After the delivery of the foregoing opinion, the case was sent to E. H. Bennett, Esq., as an assessor. under an order directing him to ascertain and report "what was the value to libellants of said whale, at the time and place it was taken possession of by the Zone —viz., on the 23d of July, 1852. in the Ochotsk Sea," with a direction to receive evidence of the opinion of competent persons, as to the value; and also to report the quantity of oil and bone yielded by the whale.

After hearing the parties, the assessor made a report, which was filed February 29th, in which he reported as follows:—"I report the value of said whale to the libellants, at the time and place it was taken possession of by the Zone, was $2350. The respondents. claimed, that by the terms of the order, the assessor should take into consideration. in fixing said value, the risks and uncertainties that the proceeds of said whale would have been in fact realized by the ship Hillman. even if the whale had not been picked up by the ship Zone, and offered some testimony upon that point. If such risks shall be taken into account, I report the value, at the time and place aforesaid, to

have been to the Hillman, $2000." He also reported the amount of oil originally yielded by the whale, to have been one hundred and twenty barrels, and the amount of bone, one thousand eight hundred pounds. In the supplemental report, furnished at the call of the respondents, the assessor stated that he had arrived at the sum first reported, by estimating the value of the oil and bone at the prices respectively at which the Hillman sold her cargo, on her arrival at New Bedford, on March 17th, 1854, and deducting therefrom the cost of casks, five per cent. for leakage and shrinkage, insurance on the three-quarters not covered by policy on outfits, and the small incidental charges usually incurred at the home port, such as wharfage, cooperage, &c., amounting in all to $378.80.

Upon the coming in of the assessor's report. the libellants excepted only on one point, viz: the finding of the assessor, as to the quantity, upon the evidence reported, which they claimed should be fixed at one hundred and thirty barrels, instead of one hundred and twenty. The respondents also excepted to the finding of the assessor on this point; claiming that the quantity should be only one hundred and ten barrels, and excepted otherwise to the report in the following particulars:—That no allowance was made for the freight of said oil and bone home; that no allowance was made for the labor of the Zone, in cutting in and boiling out and stowing down said whale; and that no deduction has been made for the crew of the Hillman's share in said oil, which the respondents maintained that the libellants would save, on account of releases given by witnesses, and the lapse of time. These exceptions were argued before the court, February 29th.

SPRAGUE, District Judge. The first question presented is one merely of fact, as to the amount of oil and bone originally yielded by this whale. This is an appeal from an assessor, and I shall not reverse his finding, unless it is shown that he is wrong. (The judge here reviewed the conflicting evidence.) On the whole, I cannot say that the assessor has made a mistake; he seems to have taken the medium, and I shall not disturb his finding. As to the last two exceptions, I have no doubt. The crew's claim is to a share of the proceeds of the voyage; and they have no property in the oil itself. The contract is, that out of the proceeds, when realized, they shall be paid according to their lays. It is the right and duty of the owners to protect the products of the voyage, and if unlawfully taken by any one, to pursue and obtain them, and the seamen have then a right to share in the net avails. The owners must obtain and hold them for this purpose. Otherwise, the seamen could not get redress; they have no title to the property, and could maintain no action for it. If the owners neglect to take proper means to obtain indemnity, they would be

responsible to seamen for that neglect. It is not for the respondents to say that the owners will not pay the crew. The respondents certainly have no right to their share; and an individual might as well say, when sued by a guardian, that perhaps he might never settle with his ward.

The remaining claim is for cutting in the whale, and for labor in boiling down and preserving the proceeds, and freight in bringing them home. The assessor has found that all this could have been done by the Hillman, without expense or loss, and that she has derived no benefit therefrom; and it is not shown that this finding is erroneous. The Hillman certainly would not have been justified in omitting an opportunity, or remitting her exertions, to take whales and fill up. And if she had succeeded in doing so, her loss, by the wrongful conversion of this whale, would have been diminished. But it does not appear that she did take, or could have taken, another whale in its stead, or that her crew were, or could have been, employed in any other beneficial labor, and she came home without a full cargo, and with capacity to have brought the oil and bone of this whale. The exceptions are not sustained.

[This general principle may be illustrated by a case which, at first sight, seems to have little analogy to the present—that of a wrongful discharge of a mariner abroad. Notwithstanding his claim upon the owners, he is bound to earn wages or his passage, coming home, if he can reasonably do so, taking into account his previous capacity; but if he has no opportunity, then he may recover full wages and expenses besides. It is only held that he must use reasonable means and not lie by. Applying this here, the Hillman was to use reasonable means to indemnify herself. She was not to neglect chances of filling up. If she had come home full, that would have diminished her loss. But upon the facts found, she cannot be called on to pay another ship, for what would have cost her nothing. The answer to the claim made for the labor is, that it was done without request by the libellants, and without any benefit to them. In regard to freight it is not quite so clear. But I cannot see that the assessor is in error. I do not find facts enough to show any benefit to the Hillman from the respondents bringing the oil. The burden is upon them to show that the Hillman has been benefitted by their services before they can claim any compensation.] [2]

[After the exceptions had been overruled as above, the libellants then moved that the first value stated by the assessor in his report be accepted. Upon this question whether any allowance shall be made for risks, the parties were heard and a decision reserved until March 8th, when the question was thus disposed of.] [2]

SPRAGUE, District Judge. The question is, whether an allowance should be made to the respondents, from the value of the whale, on the ground that it was uncertain whether the Hillman would have found the whale, cut it in, and stowed down the oil in safety. I think that no such allowance should be made; and I will state the reasons. It has already been decided, that this whale was the property of the libellants, and was wrongfully converted by the respondents to their own use. Now, although I reject the doctrine of punitive or exemplary damages, yet care should be taken, that full indemnity is given. If substantial doubts exist, they must operate against the wrongdoer. In this case, there is an entire uncertainty as to the risk. There is a very high probability, from the weather, and the nearness of the ship, that the Hillman would have obtained the whole value of the whale. To allow anything, would deprive the libellants of so much of their property, upon a conjecture that they might have lost it. I am not aware that any such deduction ever been made in analogous cases. The whale might, at any time, even after it was alongside the Zone, have been reclaimed, without deduction or compensation.

Another principle in the maritime law is applicable. The claim here is, that the respondents have saved the property from certain hazards. This is in the nature of a salvage claim. But in order to allow salvage, the property must be taken and saved for the owner; want of good faith may forfeit all claim for salvage. I shall, for these reasons, refuse any allowance for the alleged risk, and accept the first value reported by the assessor.

A question being made as to interest, the court allowed it from the time when the Hillman had discharged her cargo, and it was ready for the market. A decree was then entered, in conformity with the above, for the libellants, in the sum of $2625.33, and costs.

---

TABER (MOODY v.). See Case No. 9,747.

---

## Case No. 13,721.

### TABER v. PERROT et al.

#### [2 Gall. 565.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1815.

JUDGMENT—RES JUDICATA—IDENTITY OF PARTIES —PRINCIPAL AND AGENT—SUBAGENT.

1. A former judgment is no evidence in an action, except between the same parties or their privies. See 1 Greenl. Ev. §§ 523, 524.

[Cited in Greely v. Smith. Case No. 5,749.]
[Cited in Farmer v. Stewart, 2 N. H. 102.]

2. If an agent to collect and receive payment of bills, transmits them to his own private agent

---

to receive the money, and place the amount, when received, to his private credit, payment to such agent is payment to the original agent; and if there be a failure, it is the loss of the latter, and not of his principal. See Story, Ag. §§ 201, 217a, 232, 233.

[Cited in Exchange Nat. Bank of Pittsburgh v. Third Nat. Bank of New York, 112 U. S. 282, 5 Sup. Ct. 143.]

[Cited in Daly v. Butchers' & Drovers' Bank, 56 Mo. 94; Gerhardt v. Boatman's Sav. Inst., 38 Mo. 67; German Nat. Bank of Denver, v. Burns, 12 Colo. 539, 21 Pac. 715. Cited in brief in Goldsmith v. Manheim, 109 Mass. 190. Cited in Power v. First Nat. Bank of Ft. Benton, 6 Mont. 251, 12 Pac. 604.]

3. A fortiori, this applies, where the money has been drawn for by a bill in favor of a third person, which has been accepted before the failure.

Assumpsit, to recover a sum of money due from the defendants, as agents of the plaintiff, who is surviving partner of the firm of Taber and Gardner, under the following circumstances: Taber and Gardner, in 1802, being owners of certain bills drawn upon the French government by General Le Clerc, sent them to France by their agent Mr. Boss, who was then bound on a voyage to Bordeaux, in the brig Polly, belonging to the plaintiff and his partner. The cargo on board was on the joint account of Boss, Taber, and Gardner; and, on the arrival at Bordeaux, it was consigned to the defendants, who were then merchants in that city, for sale. Mr. Boss, finding that he could not sell the bills placed them in the hands of the defendants, originally for the purpose of having them accepted, and ultimately for the purpose of having the proceeds, when paid by the French government, lodged in the hands of the defendants. In the mean time, the defendants advanced a return cargo for the Polly, upon the joint account of all the concern; and it was agreed, that the proceeds of the bills should, when paid, be carried to the credit of this advance. Perrot, one of the defendants, was a partner in a banking house at Bordeaux, under the firm of Perrot and Bineau, and sometime in September, 1802, the bills were, by direction of the defendants, transmitted by Perrot and Bineau to the banking house of Messrs. D'Hotel, Thomas and Co. at Paris, with instructions to procure acceptance and payment of the same bills, and to carry the amount, when paid, to the credit of Perrot and Bineau. Mr. Boss, soon afterwards, went to Paris, and while there, about the 26th of October, 1802, received a letter from Perrot and Lee, informing him, that the bills had been sent to Messrs. D'Hotel, Thomas and Co. and enclosing an open letter, introducing him to that house, and also containing directions, that the money, when received, was to be placed to the credit of the banking house of Perrot and Bineau. The letter of introduction was duly delivered to Messrs. D'Hotel, Thomas and Co. On the 12th of January, 1803, Mr. Boss called at the banking house of D'Hotel, Thomas and Co. and was there informed, that the bills had been duly accepted and paid by the French government, on the 7th of the same month; and that the amount had been duly credited to the account of Perrot and Bineau; and the credit was accordingly shown to Mr. Boss, in the ledger of the banking house. Mr. Boss immediately gave notice of these facts to the defendants by letter, and requested the amount to be passed to the credit of the voyage of the Polly, but received no answer. On the 25th of January, 1803, Messrs. D'Hotel, Thomas and Co. stopped payment. In the mean time Perrot and Bineau had drawn bills of exchange, at single usance, upon Messrs. D'Hotel, Thomas and Co. for the whole amount of the money so carried to their credit, in favor of a third person, which bills had been duly accepted, and when seen by Mr. Boss, were in the hands of another banking house at Paris. In consequence of the arrival of the Polly, on a second voyage on joint account, at Bordeaux, consigned to the defendants, Mr. Boss returned to Bordeaux about the 26th of February, 1802, and remained there until the sixth day of April following. A day or two before this time, his vessel being fitted for sea with a return cargo, he called on the defendants for an adjustment of accounts, and then was, for the first time, informed by the defendants, that they would not allow the credit of the bills received by them. Mr. Boss remonstrated with them in vain, and was, finally, obliged to settle the accounts and admit a balance due, of 45,762 francs; and at his request, and for his security, on the credit side of the account, the following memorandum was added:—"April 6. By amount of General Le Clerc's bills in the hands of Messrs. D'Hotel, Thomas and Co. not received from these gentlemen, when received to be placed to the credit of this account." The defendants afterwards commenced a suit, in Rhode Island, against Boss, Taber and Gardner, for said balance of 45,762 francs, and finally recovered judgment in said suit, which had been fully satisfied. The present action was brought to recover the amount of the bills received by D'Hotel, Thomas and Co. and carried to the credit of Perrot and Bineau, as above stated. At the trial, the defendants' counsel contended, that the action was res adjudicata, and therefore could not be sustained; and in support of this objection, offered the record of the action of Perrot and Lee v. Boss, Taber and Gardner.

Searle & Robbins, for plaintiff.

Hunter & Burrill, for defendants.

Verdict for the plaintiff.