Paddock & Field *v.* Commercial Insurance Company.

## NANTUCKET COUNTY.

**Frederick W. Paddock** *vs.* **Commercial Insurance Company** **of Nantucket.**

**Edward Field** *vs.* **Same.**

At the trial of an action on a policy of insurance on a ship, the case was reserved for the determination of the full court, with an agreement of parties that if upon the evidence the jury would be warranted in finding a verdict for a total loss, judgment should be rendered for the plaintiff; if the plaintiff was entitled to recover for a partial loss, the amount thereof should be ascertained by an assessor; and if the jury would not be warranted in finding a verdict for either a total or a partial loss, the plaintiff should become

nonsuit. The full court held that the plaintiff was not entitled to recover for a total loss; but was entitled to recover for a partial loss, if it could be shown that the ship sustained damage to a certain amount upon a certain voyage; and the case was referred to an assessor to determine that question. *Held,* that at the hearing before the assessor, or before the court on the return of his report, it was not open to the defendant to contend that the partial loss was merged in a subsequent total loss; nor to the plaintiff to claim a general average loss.

Upon the question of the amount of an injury caused to a ship by perils of the sea, evidence of what it would cost to put her in repair at the end of the voyage, without reference to the causes which made such repairs needful, is incompetent.

In an action on a policy of insurance upon a ship, the plaintiff is bound to offer evidence by which injury by perils of the sea may be distinguished from defective condition arising from wear and tear and other ordinary causes.

The findings of an assessor in matters of fact may be revised by the court upon exceptions thereto and his report of the evidence introduced before him; but, especially when they depend upon a conflict of testimony, are not to be set aside unless clearly shown to be erroneous.

The finding of an assessor, in accordance with the opinion of competent experts testifying before him, upon a question of fact referred to him, is not invalidated by his stating in his report that "it is of course impossible to determine this question with anything like certainty."

Under a policy of insurance upon a ship, which provides that the insurers shall not be liable for a partial loss, unless it shall amount to five per cent., successive partial losses by distinct gales or storms upon different passages cannot be added together to make up the requisite five per cent.; and the burden of proving a partial loss amounting to five per cent. from one gale or storm is upon the assured.

When a ship cannot be fully repaired at a port of distress, the needful temporary repairs to enable her to proceed on her voyage, as well as complete repairs made at a subsequent port, are subject to the deduction of one third new for old, in computing the amount of a loss under a policy of insurance.

ACTIONS OF CONTRACT upon two policies of insurance made by the defendants on October 7, 1851, one to the plaintiff Paddock in the sum of $5000, and the other to the plaintiff Field in the sum of $3500; and each against the usual perils upon the ship Rambler, valued at $15,000, and outfits valued at a like sum, on a whaling voyage from Nantucket to the Pacific Ocean and elsewhere and back to Nantucket; and containing this clause: " Provided, that the insurers shall not be liable for any partial loss on hemp and flax, unless the loss amount to twenty per cent. on the whole aggregate value of such articles; nor for any partial loss on sugar, flaxseed, bread, tobacco and rice, unless the loss amount to seven per cent. on the whole aggregate value of such articles; nor for any partial loss on salt grain, fish, fruit, hides, skins or other goods that are esteemed

perishable in their own nature, unless it amount to seven per cent. on the whole aggregate value of such articles, and happen by stranding; nor for any partial loss on other goods, or on the vessel or freight, unless it amount to five per cent.; exclusive, in each case, of all charges and expenses incurred for the purpose of ascertaining and proving the loss ; but the owners of such goods shall recover on a general average." The two cases were tried and argued together throughout.

At the trial before the jury, at July term 1860, the plaintiffs introduced evidence of the following facts : The ship sailed from Nantucket October 23, 1851. In September or October 1854, she put into the Sandwich Islands to transship her oil and refit, and was there refitted and repaired, and left those islands in a seaworthy condition in all respects. About May 30, 1855, she encountered a heavy gale, (which continued for twenty-six hours,) and lost three boats, but proved tight and staunch. About the last of August 1855, while on the Japan cruising grounds, she met another gale, which continued for three or four days, with very bad seas and weather, such as would strain a staunch and seaworthy ship. During this gale she sprang a leak, the place of which could not be found until she got into port. The men were kept at the pumps one hour out of every six till she got into Lahaina in the island of Maui, October 5, 1855. There the master called a survey, and the leak was found in the scarf of the stem, where it laps upon the keel. The stem had started from the strain. The stem was refastened, the leak caulked and nearly stopped, and the ship rendered seaworthy for the voyage, though she still leaked three or four hundred strokes an hour. After receiving these repairs, she put to sea, and eight or ten days out encountered strong trade winds, which increased to a gale, with heavy cross seas. All hands were put to the pumps, and the try-works were thrown overboard to lighten the ship. The gale lasted three or four days; the casks were broken out; and a leak was found in the garboard seam, on the port side abreast the foremast, and was nearly stopped. The scarf of the stem and the keel remained as when the ship left Lahaina, leaking somewhat. The

new leak in the garboard seam increased or diminished according to the sail carried on the foremast. Both pumps were kept going till the leak was found and partially stopped. The crew forced the master to put away for the Navigators' Islands, and the ship arrived at Apia on one of those islands, December 5, 1855. The officers and crew called a survey; the ship was condemned, and was sold by the consul; the master protested against calling a survey, and against the condemnation and sale. The ship then had on board a quantity of oil and bone, partly of her own catchings, and partly taken on freight at the Sandwich Islands, which the master immediately after the sale of the ship took out and put on board another vessel. Just as this transshipment was completed, a heavy gale sprang up, and both vessels were wrecked and broken up. The bone and oil were saved and stored. The consul afterwards instituted what he called an admiralty court, and had the whole cargo seized, confiscated and sold, and the proceeds distributed among his officials and other persons on the island.

The defendants contended that upon the evidence introduced by the plaintiffs they were not entitled to recover as for a total or partial loss; and the case was reported, at the request of the defendants and with the assent of the plaintiffs, by *Merrick, J.,* for the determination of the full court, with the agreement that if upon the evidence the jury would be warranted in finding a verdict for a total loss, judgment should be rendered for the plaintiffs; if the plaintiffs were entitled to recover only for a partial loss, the amount of the same should be ascertained by an assessor; and if the jury would not be warranted in finding upon this evidence a verdict for either a total or a partial loss, the plaintiffs should become nonsuit.

Upon that report, the court at January term 1861 held that the plaintiffs were not entitled to recover for a total loss of either vessel or outfits, nor for any loss of that part of the outfits which had been converted into catchings; but 'were entitled to recover for a partial loss on the vessel, if it could be shown that she sustained damage to the amount of five per cent. before her arrival at Apia; and referred the case to Henry W

Paine, Esquire, as an assessor, to determine that question. 2 Allen, 93.

At July term 1865 the assessor made his report, which stated the history of the voyage, and the subsequent proceedings relating to the ship and cargo, substantially as above; and the material parts of the residue of which were as follows:

" It was proved that the harbor of Apia was ordinarily a safe one, that vessels of the size of the Rambler could there be hove down, and that workmen and materials, except copper, could there be obtained.

" The plaintiffs produced the depositions of three experienced shipmasters, who had been at Apia, and also at Sydney in New South Wales, and had had opportunities to know what facilities there were at each of those places for the repairing of ships, and what would be the expenses attending such repairs; and these deponents were asked, assuming the history of the voyage and the condition of the ship to be as before set out, whether the Rambler could have been thoroughly repaired at Apia, whether she could have been there so repaired that she might safely proceed to a port where thorough repairs could be made, what was the best and most accessible port where the vessel could be thoroughly repaired, what would be the cost of temporary repairs at Apia, and what the cost of thorough repairs at the best and most accessible port where these could be obtained. The defendants objected to these questions; but the objections were overruled and the questions were answered.

" There was no evidence showing or tending to show any specific damage sustained by the ship, except that in the scarf of the stem and that in the garboard seam; or what would have been the cost of repairing either.

" It was proved that, to render it prudent and safe for the ship to proceed on her voyage, it would have been necessary to strip the garboard streak, refasten and recaulk it; that this might have been done at Apia after discharging cargo and heaving the ship down; and that the expense, including the cost of procuring the money, would have been $3125. These repairs would have rendered it safe for the ship to proceed to Sydney, where thor-

ough repairs could have been made; this being the best and most accessible port for the ship under the circumstances.

" It was proved that, in order thoroughly to repair the ship, to make her so staunch, strong and seaworthy that she might safely prosecute her homeward voyage, it would have been necessary to strip off her metal and sheathing, recaulk her, refasten her, and put on new sheathing and a new suit of metal; and that to do this in Sydney would have cost $10,000.

" These facts are found on the testimony of the three deponents " above mentioned. " Their opinion is based on the assumption that the voyage and condition of the ship were as before stated.

" The parties did not furnish the means of determining what proportion of the damage was caused by the first gale and what by the second.

" The assessor finds the total cost of repairing all damage to have been $13,125. Deducting one third, new for old, the partial loss is found to have been $8750. Of this sum, the defendants should pay to the plaintiff Paddock $\frac{25}{150}$ or $1458.33, and to the plaintiff Field $\frac{175}{1500}$ or $1020.83.

" The assessor has rejected all items of general average usually taken into account in the adjustment of a partial loss; because, 1st. there has been no voluntary sacrifice of a part for the safety of the residue; and 2d. the means of ascertaining the value of the contributory interests have not been furnished. ·

" The defendants contended that no recovery could be had; because, 1st. no specific sea damage sustained in any one gale had been proved to amount to five per cent.; ·and 2d. the partial loss, whatever it was, was merged in the subsequent total loss of the ship. The honorable court have the facts necessary for the determination of these questions."

The assessor, at the request of the defendants, and against the objection of the plaintiffs, reported all the evidence introduced, by deposition or orally, before him.

The defendants excepted to the assessor's report in the fol lowing particulars :

First. To his ruling that the testimony of the three shipmasters was admissible evidence in the case.

Second. To his finding, based on that testimony, as not warranted by the evidence in the case.

Third. " Because he has not reported what specific damage, if any, was done to the ship by any peril within the policy declared on, before her arrival at Apia, nor whether the same was done in one storm or in several distinct storms, nor the cost of repairing the same, if any."

Fourth. To the finding that the defendants should pay to the plaintiff Paddock $1458.33, and to the plaintiff Field $1020.83, " because the evidence in the case does not," and Fifth, " because the facts found and reported by the assessor do not, warrant the conclusion that either of those sums, or any part of either of them, is lawfully due under either of the policies declared on, by reason of any sea damage within the said policies, or either of them, sustained by the vessel before her arrival at Apia."

Sixth. " Because it is not found," and Seventh, " because there was no evidence to warrant any finding, that such sums, or any part thereof amounting to five per cent., would have been required to repair any sea damage sustained by the said ship, within the said policies, or either of them."

Eighth. " Because, inasmuch as it was not proved, and is not found, that the expenditures actually made at Lahaina to repair sea damage amounted to five per cent., and inasmuch as no expenses were proved to have been actually incurred at Apia, and the vessel was there destroyed and totally lost by a peril not insured against by these defendants, the assessor should have reported that it was not proved that the vessel did sustain any sea damage, for the cost of repairing which the defendants are liable."

Upon that report and the exceptions, the case was reserved, at the request of the parties, by *Gray*, J., for the determination of the full court, and was argued in November 1865.

*B. R. Curtis*, for the defendants.

*S. Bartlett*, for the plaintiffs.

BIGELOW, C. J. 1. The question of a merger of a partial loss in a subsequent total loss is not now open to the defendants.

2. The finding of the assessor is based on incompetent evi-
dence. The real subject matter of inquiry was the amount of
injury to the vessel, caused by sea perils, which constituted the
alleged partial loss; not what it would cost to put the vessel in
repair, either temporary or permanent, after a voyage of several
years' duration, and without reference to the causes which made
such repairs needful.

3. The plaintiffs, in order to warrant a finding by the assessor
in their favor for the amount due for the partial loss, were bound
to offer evidence by which he would be able to distinguish be-
tween injury to the vessel by sea damage, causing partial loss,
and the defects, depreciation, and want of repair attributable
solely to wear and tear and other ordinary causes during the
prosecution of the voyage.

The amount of injury to the vessel by sea damage should be
found by the assessor upon competent evidence, before we con-
sider the questions, whether successive partial losses to a vessel
can be put together to make up five per cent., and whether, if it
appears that the vessel has sustained damage by sea perils to the
amount of ten per cent. or more, the burden is on the plaintiffs
or defendants to show that in fact any part of such sea damage
was equal to less than five per cent., arising from any one cause.
The report must therefore be recommitted to the assessor. If
injury was done to the vessel by successive causes or sea perils,
the assessor will, if possible, ascertain the extent of each, and
the cost of repairing each separately.     *Report recommitted.*

At July term 1869 the assessor made his second report,
which stated the history of the voyage and the proceedings at
Apia, substantially as above; and the residue of which was as
follows:

" The cost of the repairs made at Lahaina was not shown,
and no repairs were made at Apia. No expert gave an opinion
as to what it would have cost to repair, either temporarily or
permanently, the injury sustained in the first gale by the start-
ing of the stem from the keel; or in the second gale by the
opening of the garboard seam. The assessor is therefore un-

able to ascertain the extent of the damage suffered in either gale, or proximately to determine what would be the cost of repairing it.

"A question was made whether there was any connection between the two injuries; whether the starting of the scarf did or not occasion the opening of the garboard seam. It is of course impossible to determine this question with anything like certainty. Garboard seams have opened while the stem was fast to the keel. It will be readily perceived that the working of the stem would help to open this seam. And upon the opinion of the experts I find that the opening of the garboard seam is, in this case, attributable to the working of the stem.

"The plaintiffs introduced evidence tending to show that the ship could not have had such thorough repairs of the first injury at Apia, as would have rendered her seaworthy for her voyage; but that they might have been so far repaired as to enable her to proceed to Sydney, New South Wales, the best and most accessible port where the same could have been thoroughly repaired. The defendants introduced evidence tending to show that such were the facilities for repairing ships at Apia, that the Rambler might have been put in a seaworthy condition. What would have been the cost of repairing said injuries to the ship was entirely a matter of opinion, depending upon what it would be necessary to do to her. The experts called by the defendants were of opinion that it would be necessary to discharge the cargo, heave the ship down, and strip off the sheathing above the place of the leak; if the garboard streak was sound, to caulk it; otherwise, to repair with a new piece so much of the old plank as proved unsound, and no more. The plaintiffs' experts were of opinion that, to thoroughly repair said injury to the ship, which had been so strained, it would be necessary to strip her entirely and recaulk her all over. In this conflict of opinion, I find that the injuries to the ship could not have been thoroughly repaired at Apia, though I cannot adopt the estimate of the cost of needful temporary repairs at Apia made by the plaintiffs' witnesses.

" I find the cost of such repairs of said injuries to be $2000, including the expense of raising the money; and I find it would have cost $10,000 to repair the said injuries to the ship thoroughly at Sydney. Two thirds of this sum, added to the cost of the temporary $2000, make a total of $8867. Of this sum Paddock should recover one sixth, to wit, $1477.83, and Field, $1034.48, with interest.

" I have not made a general average account, as I understand that by the rescript of the court the plaintiffs are restricted to the recovery for partial loss of the vessel."

The defendants excepted, First. " To so much of the finding of the assessor's report as connects the loss occasioned by the starting of the scarf in the gale of August 1855, with that occasioned by the opening of the garboard seam in the gale after leaving Lahaina." Second. " To the finding of the assessor, that such repairs could not be made at Apia as would render the vessel seaworthy for the voyage." Third. " To the finding which allows the whole cost of temporary repairs made at Apia, and adds the same to two thirds of the cost of repairs made at Sydney." Fourth. " To the finding that the plaintiff Paddock is entitled to recover $1477.83 and interest, and the plaintiff Field $1034.48 and interest; and the defendants submit that they are not entitled to recover any sum whatever."

The assessor, at the request of the defendants, and against the objection of the plaintiffs, reported so much of the evidence as related to the findings thus excepted to. And the questions raised by these exceptions were reserved by *Ames,* J., for the decision of the full court, before which the case was now argued by the same counsel.

GRAY, J. Several of the exceptions taken by the defendants to the assessor's report relate to mere questions of fact.

1. The learned counsel for the plaintiffs contends that it is not competent for the assessor to report the evidence, nor for the court to examine it, for the purpose of revising his findings upon these questions. But this position cannot be maintained. Whenever in any civil action, facts are found otherwise than by the judge, the findings are subject to the revision of the court,

upon the evidence being properly brought before it. Even the verdict of a jury may be set aside as against evidence and the weight of evidence. When a case at law or in equity is referred to an auditor, his report is made by statute *primâ facie* evidence only at the trial or hearing, and even his findings upon questions preliminary to the admission of testimony may be revised by the court upon a motion to recommit his report. Gen. Sts. *c.* 121, § 46. *Morgan* v. *Morse,* 13 Gray, 150. *Crafts* v. *Crafts,* Ib. 360. *Kendall* v. *May,* 10 Allen, 59. Whenever, in the absence of special provisions of statute or of the rule of reference, a case at common law, or in equity or admiralty, is referred to a subordinate officer, for the purpose of finding facts and reporting them to the court, whether he is styled assessor, auditor, master in chancery, or commissioner, his findings may be reviewed by the court ; and the appropriate way of bringing them before the court for this purpose is by specific exceptions to his findings, and by his report of the evidence upon the points on which exceptions are taken ; but his findings have the weight of a verdict, and, especially when they depend upon a conflict of testimony, are not to be set aside unless they clearly appear to be erroneous. *Donnell* v. *Columbian Insurance Co.* 2 Sumner, 366. *Taber* v. *Jenny,* 1 Sprague, 315. *Heebner* v. *Eagle Insurance Co.* 10 Gray, 131, 143. *Fisk* v *Gray,* 100 Mass. 191. *Dean* v. *Emerson,* 102 Mass. 480.

2. On the question whether the starting of the scarf of the stem did or did not occasion the opening of the garboard seam, the statement of the assessor, " that it is of course impossible to determine this question with anything like certainty," is not inconsistent with the affirmative thereof being established by a fair preponderance of the evidence. And his finding accordingly is not shown, upon a careful revision of the testimony, to be so clearly erroneous that it should be set aside.

3. The assessor's finding that such repairs could not have been made at Apia as to make the vessel seaworthy for the voyage is founded upon the weighing of conflicting testimony and must also stand.

4. In recommitting the report to the assessor, his attention was called to the distinction between injuries caused by perils of the sea, and defective condition of the vessel arising from wear and tear and other ordinary causes. He must be presumed to have kept in mind this distinction. And upon a fair construction of his report, the injuries which he finds to have been proved must be taken to be injuries by perils of the sea only.

Having thus disposed of the exceptions to the assessor's report, so far as they relate to questions of fact, we proceed to the consideration of the exceptions in matters of law.

5. The first of these presents the question whether the partial losses of the vessel, the one before putting into Lahaina, and the other after leaving that port, can be added together to make up five per cent. on the valuation, within the meaning of the clause in each policy, which declares that the insurers " shall not be liable for any partial loss " on other goods than those previously specified, or on the ship or freight, " unless it amount to five per cent., exclusive, in each case, of all charges and expenses incurred for the purpose of ascertaining and proving the loss."

It is universally admitted that this clause was inserted in policies of marine insurance to prevent dispute and litigation about losses of trifling amount, arising from the perishable nature of goods, or which might reasonably be borne by the assured as coming within the common wear and tear of the ship. The words of the clause exclude every distinct loss not exceeding five per cent. ; for they declare that the insurers shall not be liable " for any partial loss," unless it amounts to the requisite percentage ; and adding two such losses together does not change the nature or the amount of either.

The earliest decision upon this point is that in which this court in 1828 adjudged, in the case of a vessel insured by a policy of this form, " that distinct and successive losses are not to be added together in order to make up the five per cent. ; but that the damage from disasters happening at one time, or in one continued gale or storm, is to be considered by itself." *Brooks*

v. *Oriental Insurance Co.* 7 Pick. 259, 267. Whether the same rule would apply to cargo was then left, and is still, an open question in this court.

In 1832, it was held by the English court of exchequer, that under the words " free from average," " on all other goods and on ship, under £3 per cent., except general," a partial loss of the ship, by stranding after entering a river, might be added to a previous loss of a boat at sea, in order to charge the underwriters ; although each of the losses, taken by itself, was less than three per cent., and there could be no difficulty in estimating the amount of each separately. *Blackett* v. *Royal Exchange Assurance Co.* 2 Tyrwh. 266, and 2 Cr. & Jerv. 244. That case illustrates how far the construction contended for by the plaintiffs, if adopted, may be carried. It was decided before the English courts had become accustomed to refer to American decisions upon questions of maritime law. The only reason given is, that the words were ambiguous, and introduced an exception for the benefit of the underwriters, and should therefore, " in the absence of usage and authority," be construed most strongly against them. And the words in that policy, " free from average," though substantially equivalent to the words in these, " not liable for any partial loss," did not perhaps so clearly suggest a distributive effect.

In 1836, Mr. Justice Story, while expressing his regret at the narrow ground upon which the English decision was placed, declared that, if he had been called upon to give a construction, " wholly independent of authority or usage," to the clause in its American form, in a policy of insurance upon a ship, the strong inclination of his mind would have been towards holding it to apply, even in that case, to an aggregate of losses during the whole voyage. But the matter in judgment before him concerned only the cargo ; for the partial loss of the ship was not proved, upon either construction, to exceed five per cent. And after stating the rule affirmed in *Brooks* v. *Oriental Insurance Co.*, he said that, although upon questions of commercial law the courts of the United States were not generally considered to be absolutely bound by the decisions of the state courts, yet,

in deference to the opinion of this court, and from his own anxiety to follow the current of decisions upon commercial questions, ("as to which," he observed, "Lord Mansfield's remark is well founded, that it is less important how they are settled than that they should be settled,") he "should implicitly have adopted this doctrine on the present occasion, if it had been applicable to it." *Donnell* v. *Columbian Insurance Co.* 2 Sumner, 366, 378.

Those reasons apply with increased force to an attempt, first made after the lapse of nearly forty years, to induce this court to overrule its own decision upon a question of this kind. The parties to these policies, and all others making contracts of insurance in this form, (which they might have varied at their pleasure,) may reasonably be supposed, in this Commonwealth at least, to have acted on the rule of law as thus established, and great injustice might be done by now adopting a different construction of the same words. *Blanchard* v. *Equitable Safety Insurance Co.* 12 Allen, 386.

6. The defendants, by the terms of their policies, not being liable for a partial loss unless it amounted to five per cent., or the ship was stranded, the plaintiff has the burden of proving a loss from a cause and to an amount for which the defendants are liable. Such was the rule applied by this court to a clause similar in form to that now in question, and providing that the insurers of a steamboat should not be liable for any breaking of the machinery, unless occasioned by stranding. *Heebner* v. *Eagle Insurance Co.* 10 Gray, 131. So, in the present cases, if the plaintiffs seek to recover for a partial loss, either upon the ground that it was occasioned by stranding, or that it amounted to five per cent., they must prove the fact necessary to charge the underwriters. The affirmative of the proposition rests with the plaintiffs ; the means of proof, to say the least, are as much within their knowledge and reach as within those of the defendants ; and the difficulty of proving the amount of loss from any one cause is no greater than that of furnishing evidence which would enable the assessor to distinguish between injury to the vessel by perils of the sea, and defective condition attributable to wear and tear and other ordinary causes, which, when these

cases were last before the court, the plaintiffs were held bound to produce.

The plaintiffs have failed to sustain the burden, thus resting upon them, of proving the amount of the partial loss by each peril; and it would be useless to again recommit the report, inasmuch as the assessor, after having been directed, upon the former recommitment, if injury was done to the vessel by successive causes or sea perils, to ascertain, if possible, the extent of each, and the cost of repairing each separately, now reports that he is unable to ascertain the extent of the damage suffered in either gale, or proximately to determine what would be the cost of repairing it. The loss which he finds to have been occasioned by the two gales amounts, after making the deduction to be presently mentioned, to more than ten per cent. on the valuation of the vessel. The amount of the loss caused by one of the gales must therefore have been more than five per cent. Whether the amount of the loss caused by the other did or did not reach five per cent. is left in doubt. As the plaintiffs cannot recover for a loss not proved to amount to five per cent., and as one of the losses is not proved to equal that amount, each of the plaintiffs must remit so much of the sum reported by the assessor as the insurers are not shown to be liable for, or, in other words, must deduct a trifle less than five per cent., or, what may for practical purposes be taken as the same thing, just five per cent., on his share of the valuation, from the amount with which the insurers are to be charged, and, upon making such remission, may take judgment for the residue.

7. The assessor having found that the ship could not have been thoroughly repaired at Apia, the amount of needful temporary repairs at that port is to be added to the estimated cost of complete repairs afterwards at Sydney. But the amount of such temporary repairs (including the necessary expenses of raising money therefor) as well as the amount of the final repairs, is subject to a deduction of one third new for old. *Brooks v. Oriental Insurance Co.* 7 Pick. 259. *Orrok v. Commonwealth Insurance Co.* 21 Pick. 456. *Lincoln v. Hope Insurance Co.* 8 Gray, 22, 26. The assessor having allowed such deduction from

the amount of the repairs at Sydney only, his report must be amended by making a like deduction from the amount of the temporary repairs found by him.

8. The plaintiffs' claim to recover for a general average loss was rightly disallowed by the assessor. A general average loss is distinct in its nature from a partial loss; it requires proof of a voluntary sacrifice for the benefit of the cargo and freight as well as of the ship, and is not computed in making up a constructive total loss, nor subject to the deduction of one third new for old. *Greely* v. *Tremont Insurance Co.* 9 Cush. 415. At the original trial of the present cases, the only claims made by the plaintiffs, or reserved for the determination of the full court, were for a total loss and for a partial loss. The court decided that the plaintiffs were not entitled to recover for a total loss, and that the question of a partial loss must be referred to an assessor. 2 Allen, 93. And that question only was so referred. Under these circumstances, it was held, when these cases were last before the court, that it was too late for the defendants to contend that a partial loss could not be recovered because it had been merged in a total loss. The rule of practice, by the application of which the defendants were prevented from raising a question concerning the ground of action, after the reference to the assessor, which they had not previously suggested, is quite as applicable to the plaintiffs' claim, first made at this late stage, not included in the original reservation, nor referred to the assessor, for a general average loss.

The result is, that from the amount of loss found by the assessor on the whole ship, $8666.67, there is to be deducted in the first place one third of temporary repairs at Apia, $666.67; and from the balance of $8000 is to be deducted five per cent. on the valuation, or $750, leaving the amount of the partial loss on the vessel $7250; of which the proportion due to the plaintiff Paddock is one sixth or $1208.33, and that due to the plaintiff Field $845.83, and interest.

*Judgments for the plaintiffs accordingly.*