283

MIDWEST MARINE, INC., a corporation, and Glens Falls Insurance Company, a corporation, Plaintiffs,

v.

STURGEON BAY SHIPBUILDING & DRY DOCK COMPANY, Defendant.

No. 61–C–1.

United States District Court
E. D. Wisconsin.

Nov. 4, 1965.

---

Edward B. Hayes, William K. Johnson and John P. MacRae, Chicago, Ill., Harney B. Stover, Jr., Milwaukee, Wis., for plaintiffs.

Sparkman D. Foster and John A. Hamilton, Detroit, Mich., John A. Kluwin and Bernard J. Hankin, Milwaukee, Wis., for defendant.

GRUBB, District Judge.

This is an action by Midwest Marine, Inc., an Illinois corporation (hereinafter designated "Midwest") to recover for

damages to two White Superior diesel engines that the defendant, Sturgeon Bay Shipbuilding & Dry Dock Company, a Wisconsin corporation (hereinafter designated "Sturgeon Bay"), partially overhauled and installed in the M. V. EDWARD W. RENWICK (the vessel has been renamed and will be referred to hereinafter as the "TAMMY GRANT"). The intervening plaintiff, Glens Falls Insurance Company, is the partially subrogated insurer of Midwest. The word "plaintiff" will be used to refer to Midwest unless otherwise noted. The defendant has counterclaimed against the plaintiff for pay for the work it did on the TAMMY GRANT.

Jurisdiction is based on diversity of citizenship, and the amount in controversy exceeds $10,000.00.

 This case, involving a contract for repair of a vessel, is governed by maritime law; and an oral contract for repair of a vessel gives rise to an implied warranty of workmanlike services. Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2d Cir. 1958). Trial of the case was to the court.

The TAMMY GRANT was acquired by Midwest in July 1959. This vessel was delivered to the defendant for the purpose of removing the engines in it at the time of acquisition by Midwest and installing the two engines involved in this litigation, and doing other work not here involved.

The engines in question are two of three engines that at one time were in a vessel known as the MARJELEA. In July 1957, these three engines were purchased by Chicago Towing Company for $50,000.00. Chicago Towing Company is related to Midwest—Kenneth Hales serves as president of both corporations. The three engines in the MARJELEA were mechanically identical except for the direction of crankshaft rotation. These engines had been in the MARJELEA since that vessel was built in 1947. They were overhauled every twelve to eighteen months. The last overhaul of the engines was four months before they were removed from the MAR-JELEA. At the time of their removal, the engines had at least eight months' running time before another overhaul would be required. Prior to their removal, all three engines were operating equally well. These three engines were removed from the MARJELEA by the defendant in July 1957. One engine was placed in the vessel HARBOR KING which was built for Chicago Towing Company by the defendant. No work, other than cleaning, was done on this engine before it was placed in the HARBOR KING. This vessel went into operation in early 1958. The HARBOR KING was in operation continuously until the time of trial in this case and had been given the routine overhaul twice. The remaining two engines, those involved here, were placed in storage on the defendant's premises. These engines were sold to Midwest by Chicago Towing Company in July 1959.

In May 1959, Kenneth Hales, president of Chicago Towing Company and Midwest, authorized the defendant to inspect these engines. The results of this inspection were reported orally to Hales by a group consisting of defendant's shop superintendent, chief engineer, and machinist foreman. The substance of the report was that the engines showed normal wear and tear for ten-year-old engines. Sturgeon Bay recommended that certain specific items of work be done on the engines. Midwest authorized that all the recommended work be done. In the course of the inspection an accumulation of carbon, approximately three-fourths of an inch thick, was found inside the engines. Sturgeon Bay undertook to clean the interior of these engines and the related component parts of the lubricating oil system. Measurements of the engine parts, taken during the inspection, indicated that the engines should provide a year's service before needing a major overhaul.

After the completion of the cleaning and the work on the engines, they were reassembled and installed in the TAMMY GRANT by defendant on foundations built in the vessel by defendant.

When the foundations were installed, the tops of the foundations—the rider bars—were at a lower level than the expected level of the bottom of the engine bases—the bedplates. This was done to allow some maneuverability to the engines in order that they could be properly aligned. The difference in the elevations of the rider bars and the bedplates was adjusted by the use of chock blocks, pieces of cast iron, resembling wedges, placed between the rider bars, and the bedplates.

The engines were held in place on the foundation by "hold down" bolts that went through the bedplate, the chock block, and the rider bars. The bolts were tightened by using a wrench and a six or eight-pound sledge hammer. After the engines were tightened onto their foundations, an employee of defendant, Frank Kiehnau, took crankshaft deflection readings, which indicate the extent of strain on the crankshaft, and gave the results of these readings to his immediate superior, Mr. Luedtke, machinist foreman of defendant.

Before all the work and installation was completed, Midwest entered into an oral agreement with Code Grant, d/b/a Grant Towing Company, under which Grant would charter the TAMMY GRANT, with the charter hire to be $3,500.00 per month.

When all the work on the vessel was completed, it was given dock and sea trials by the defendant. At the time of these trials, Grant and his prospective chief engineer, Mr. Wills, were present. During the course of these trial runs, a problem was encountered with the lubricating oil strainer (hereinafter designated the "knife edge strainer"). This knife edge strainer was continually stopping up with what appeared to be sludge from the engine. Mr. Wills talked to an employee of defendant about this and was told that the problem was caused by carbon breaking loose inside the engine, and that the condition would be corrected by the movement of the vessel on the delivery run from Sturgeon Bay, Wisconsin to Joliet, Illinois.

After the trial runs, the defendant delivered the TAMMY GRANT to Midwest at the shipyard of A. L. Mechling Barge Lines, Inc. in Joliet.

On the day the TAMMY GRANT arrived at Joliet, Hales expressed dissatisfaction with the condition of both engines to the secretary and to the chief engineer of the defendant. Hales said that he thought the vessel should be sent back to Sturgeon Bay. Hales agreed to accept the vessel when the defendant's secretary assured him that the defendant was a reputable shipyard and would stand behind its work, and that the defendant would leave one of its personnel, Mr. Kiehnau, aboard the vessel until the vessel was in proper operating order.

While the boat was still at Joliet, Kiehnau went to Hales and Grant and told them that crankshaft deflection readings had been taken before the vessel left Sturgeon Bay, and that these readings indicated that the engines needed new main bearings, and that if the vessel was operated with the bearings in the condition indicated by the readings, trouble was inevitable.

Hales discounted the ratings because he had been told earlier by Sturgeon Bay that the bearings were adequate for a year's service and because an employee (unnamed) of the Mechling shipyard at Joliet told him the ratings may or may not be accurate.

On October 20, 1959, the TAMMY GRANT went into service, operated by the charterer, Code Grant. It remained in service for twelve days until November 1, 1959. For the first five days of operation, defendant's man Kiehnau was aboard the vessel.

During this period of operation, the knife edge strainers, one on each engine, were a constant problem. They would plug up and would have to be cleared at intervals ranging from five minutes to an hour. On this type of strainer, it would be normal to clear it once in a six-hour watch.

During the twelve-day period of operation, it was necessary to change the

lubricating oil filters three times. Under normal conditions, lubricating oil filters should last from 800 to 1,000 hours.

On November 1, 1959, as the TAMMY GRANT was towing barges north from Cairo, Illinois, on the Mississippi River, the starboard engine broke down. The cause of the breakdown was the breaking of the drive chain which operates the lubricating oil pump. The pump itself was stuck or frozen.

The drive chain and the pump were taken to be repaired. An examination of the oil pump disclosed a burr on the gears.

After the chain had been repaired and replaced on the starboard engine, the engines were started and idled for some minutes to allow them time to warm up. When the vessel was about to get under way, the engines were brought to their full normal operating speed and the starboard engine stopped. An immediate inspection showed that the drive chain for the lubricating oil pump had broken again, and the pump was frozen or locked.

After the drive chain broke the second time, the first assistant engineer on the TAMMY GRANT removed inspection plates on the starboard engine and discovered babbitt metal flakes on various engine parts. An inspection of the thrust bearing on the starboard engine showed that the babbitt metal on the bearing was wiped and scored. A similar condition was found when a second main bearing was examined.

At this point the barges being towed by the TAMMY GRANT were taken back to Cairo. Two trips were made, since the vessel was towing at a reduced power with only the port engine in operation. Thereafter the vessel went to a shipyard at Cape Girardeau, Missouri. Midwest notified the defendant of the breakdown of the engines of the TAMMY GRANT, orally and in writing, on November 13, 1959.

At this shipyard, the starboard engine was dismantled further. All the remaining main bearings were found to be in the same condition—wiped and scored—as the first two examined. All the con-

necting rod bearings were in the same condition as the main bearings. When the No. 4 piston was removed from the engine, a piece of metal, about the size of a nickel and three-eighths of an inch thick, was found between the top of the connecting rod bearing and the rod itself. This piece of metal was partially obstructing a lubricating oil passage through which oil passed to lubricate that piston. The piston, the piston rings, and the cylinder liner were badly worn on the side opposite where the piece of metal was found. On post-trial briefs, the defendant conceded responsibility for this piece of metal.

The crankshaft of the starboard engine was examined and showed deep scoring. The engineers on the TAMMY GRANT decided that the crankshaft would have to be removed for repairs. To remove the crankshaft it is necessary to take the engine block off the engine base. As one of the bolts which held the block to the base was loosened, a loud noise occurred, sounding as if a piece of metal had broken. As other bolts were loosened, smaller "popping" noises were heard. An examination of the engine block did not uncover any cracks in it.

Then the port engine was disassembled. The main bearings and the crankshaft in that engine were found to be scratched and scored.

In the course of the examination of the port engine, a White Motor Company employee attempted to remove the thrust bearing from that engine, using the normal procedure for removal—placing a cap screw in a hole in the crankshaft and rotating the crankshaft so that the cap screw will catch on the bearing and roll it out. On the port engine this normal procedure would not work because the crankshaft was exerting too much pressure on the bearing. When the employee attempted to rotate the crankshaft and roll out the bearing, the cap screw, three-eighths of an inch in diameter, was bent. In order to get the thrust bearing out, it was necessary to loosen the cylinder block from the bedplate and the bedplate from the engine foundation.

In the course of dismantling the engines, it was necessary to drain the oil from the base of the engines. When the starboard engine was drained, there remained in the base of the engine a one-half inch layer of a material described as dirt and sludge. The base of the engine is 16 feet by 3 feet. This material had a gritty feel, as if there were sand in it. A subsequent analysis of the material showed that it contained carbon particles, beach sand, metal chips, wood chips, and insect carcasses.

While the TAMMY GRANT was at Cape Girardeau in December 1959, an inspection of both engines was made by an employee of the White Motor Company. During the course of the inspection, measurements were made on each engine of the clearances between the cylinder block and the bedplate upon which it rests. Measurements were made at each bearing on the engines. On the starboard engine, left side, the clearances ranged from zero to five-thousandths of an inch. On the starboard engine, right side, the clearances ranged from three-thousandths of an inch to eighteen-thousandths of an inch. On the port engine, the clearances were taken only on the left side and ranged between two and one-half thousandths of an inch to twelve-thousandths. Normally, there should be no clearance between the bedplate and the cylinder block.

The White Motor Company employee also examined the bearing saddles on both engines. Bearing saddles are attached to the bedplate and support the crankshaft. The employee was unable to place an arbor in the bearing saddles on the starboard engine. He then took measurements that showed that six of the nine bearing saddles on the starboard engine and seven of the nine bearing saddles on the port engine were out of round. Bearing saddles are supposed to be round.

A crankshaft deflection reading taken by the White Motor Company representative indicated a deflection beyond recommended tolerance at the No. 8 cylinder of the port engine.

Measurements were made by a ship-yard machinist at Cape Girardeau of the clearance between the chock blocks and the bedplate. The measurements were made by placing feeler gauges between the chock blocks and the bedplate. The gauges started at one ten-thousandth of an inch and became progressively larger. On some blocks no gauge could be inserted; on others, the one ten-thousandth gauge or larger gauges could be inserted. There should be no clearance between the chock blocks and the bedplate.

The machinist also took measurements of some of the cylinder liners in each engine and found them to be out of round.

A naval architect took measurements of the rider bars on the TAMMY GRANT. On the starboard engine, the outboard rider bar had a slightly convex surface; the inboard rider bar had a slightly concave surface. On the port engine, the outboard rider bar had a one-eighth inch bow, and the inboard rider bar had a three-eighths inch bow. Both surfaces were convex. Measurements also showed that the forward ends of the port rider bars were lower than the after ends. On the starboard engine, the forward ends of the rider bars were lower than the after ends, with the forward end of the outboard girder one-eighth inch lower than the forward end of the inboard girder. Rider bars should be level.

The chock blocks which were placed between the rider bars and the bedplate on both engines were introduced into evidence at the trial. The thickness of these blocks, as measured with a hand ruler, ranged from one and one-half to two inches. Normally chock blocks should be nearly uniform in thickness. Defendant's general superintendent and vice president said that as far as he knew, chock blocks may have a variation of three or four-thousandths of an inch.

Plaintiff's expert McLean, in response to a hypothetical question which described the history of the engines, their cleaning, partial overhaul and installation, their subsequent operation, breakdown, and dismantling, and which incorporated the measurements described

above, testified that it was his opinion that the basic cause of the damage to the engines was that the supporting foundations were out of line to such an extent that when additional work was done—use of chock blocks, mounting the engines, and tightening them down—the bedplates of the engines were sprung. The tightening of the bolts forced the bedplates to follow the distortions in the foundations.

McLean related other occurrences and conditions to this basic problem. As a result of the sprung bedplates, the bearings were no longer parallel and the wiping action took place. The piece of metal partially obstructing the oil flow to the No. 4 piston on the starboard engine resulted in a wiping action, and the wear on the parts opposite the piece of metal occurred. Wear in cast iron takes the form of fine sandlike particles, resembling carbon in appearance. Carbon was formed as a result of the heat created by the rotation of the journals in the bearing without proper lubrication. The popping noises heard when the hold-down bolts were loosened on the starboard engine were caused by the release of tension between the parts.

Defendant's expert Clark was of the opinion that the basic cause of the trouble in the engines was due to bearing failure caused by improper lubrication. In his opinion, intense heat created by the failure of the bearings would be sufficient to distort the engine blocks or the bedplates.

The plaintiff's expert, a consulting engineer, was a graduate of the United States Naval Academy and for nearly thirty years has worked extensively with diesel engines. He made a personal inspection of the TAMMY GRANT after the breakdown. Defendant's expert was neither a graduate engineer nor a licensed engineer. His main experience has come from operating vessels and being active in the management of a barge and tug line. He made no inspection of the vessel.

The Court was impressed by the testimony of plaintiff's expert McLean, and found his opinion to be more consistent with the other evidence in the case.

In light of the evidence summarized above, the Court finds that the defendant was negligent in the following respects: (1) In cleaning the engines, (2) in reassembling the engines after completion of the overhaul work, (3) in constructing the foundations for the engines, and (4) in installing the engines on the foundations.

These findings clearly bring the case within the maritime law of implied warranty of workmanlike services under an oral contract for the repair of a vessel and support the imposition of liability based on breach of implied warranty of workmanlike services.

In making the determination of liability in this case, the Court has carefully considered the contentions advanced by the defendant and, for the reasons briefly set forth in the following paragraphs, has found them to be without merit.

Defendant's position that the damage was due to wear and tear and worn out parts is contrary to the evidence in this case. The engines were overhauled four months before they were removed from the MARJELEA and had an expected service period of at least eight months before needing an overhaul. Before their installation in the TAMMY GRANT, defendant's personnel estimated the engines to have one year's service in them. The third engine of the three taken from the MARJELEA, one mechanically identical with the two in litigation, was still functioning at the time of the trial in this case after undergoing routine overhauls and operating for a substantially longer period of time.

The defendant has made the contention that the engine damage was due to lack of lubrication because of the failure of the lubricating oil pump. This contention appears to be based on the assumption that when the drive chain on the lubricating oil pump of the starboard engine broke, the engines continued to run without lubrication. The evidence is undisputed that what occurred on the day of the breakdown was that when the drive chain broke, the engine stopped almost immediately. This contention is further

defeated by the fact that while the port engine was found to have substantially similar damage as the starboard engine, the port engine had a separate lubricating oil system, and the lubricating oil pump on that engine did not stop operating.

■ The defendant also asserts that the plaintiff failed to mitigate damages. The plaintiff challenges this assertion as an affirmative matter not pleaded, as not set forth in pretrial briefs as required by the pretrial order, and as insufficient on the merits.

Assuming that the issue of mitigation of damages is properly before the court, the facts established by the evidence in this case and the applicable law do not support defendant's position.

Indications of difficulty with the engines—the crankshaft deflection readings, the dirty oil, and the frequent clogging of the knife edge strainers—were known or should have been known to defendant at the conclusion of dock and sea trials. Nevertheless, the defendant operated the vessel on the delivery trip from Sturgeon Bay, Wisconsin to Joliet, Illinois. On the day the vessel arrived at Joliet, when the president of Midwest expressed dissatisfaction with the condition of the engines, defendant's secretary told him that the defendant was a reputable shipyard and would stand behind its work. To further assure plaintiff in this regard, the defendant assigned one of its employees to remain on the TAMMY GRANT. Having been given such assurances, plaintiff cannot be said to have acted unreasonably in turning the vessel over to its charterer for operation. These assurances constituted the reason why plaintiff and plaintiff's charterer accepted the vessel and commenced operation. Defendant's encouragement of operation of the vessel is not consistent with a claim that the plaintiff failed to mitigate damages. Any failure to mitigate, under the facts of this case, does not reduce the amount of recovery, since any such failure to mitigate was due to the representations and assurances of the defendant. Krauss v. Greenbarg, 137 F.2d 569 (3rd Cir. 1943).

## DAMAGES

A discussion of the damage question requires a brief outline of events occurring after the TAMMY GRANT broke down on November 1, 1959. After the vessel transferred her barges, she proceeded to the Missouri Dry Dock & Repair Company shipyard at Cape Girardeau, Missouri. There the dismantling of both engines, as described above, was completed, and certain other work was done on the TAMMY GRANT. The vessel was inspected there by an employee of White Motor Company and by plaintiff's expert. While at Cape Girardeau, the crankshaft of the starboard engine was removed and shipped out to be rechromed.

In February 1960, the TAMMY GRANT was towed to the Calumet Shipyard & Dry Dock Company in South Chicago. There the engines were removed, crated, and loaded on a truck to be sent to the White Motor Company in Springfield, Ohio, for further inspection. After this inspection, Midwest decided to purchase new engines and install them on new foundations in the TAMMY GRANT. The engines were purchased from White Motor Company for $74,774.00. They were installed by Calumet for $23,000.00. Thereafter the TAMMY GRANT returned to service on May 17, 1961.

The damages sought to be recovered by plaintiff may be divided into four categories: engine damage, loss of use, out-of-pocket expenses, and interest.

### 1. *Engine Damage*

■ The proper rule as to the measure of damages in case of damage to a vessel is the cost of repair and not the replacement cost where repairs can be made at substantially lower cost and would render the vessel as serviceable as before. Zeller Marine Corporation v. Nessa Corporation, 166 F.2d 32 (2d Cir. 1948).

The record shows two different figures as the possible basis for determining the cost of repairing the engines. Defend-

ant's expert estimated the cost of repair to be $20,000.00, and White Motor Company bid $62,000.00 for the repair of both engines. The variance between these two figures is explained in terms of the type of facility that could accomplish the repair job. Defendant's expert was of the opinion that a number of shipyards along the rivers could have made the repairs necessary on the TAMMY GRANT. Plaintiff's expert, on the other hand, was of the opinion that only a half dozen facilities in the United States would be capable of accomplishing a job of the magnitude required to remedy the distortion in the engines and bedplates of the TAMMY GRANT. White Motor Company was among those named. Further, Anton Drabik, a marine surveyor, testified that he knew of no instances in which the shipyards maintained along the waterways had repaired engines with a twist in the entire engine, as was the condition of the engines of the TAMMY GRANT.

In view of all the evidence in this case, the Court finds that it would have been reasonable for the plaintiff to accept the higher bid of the White Motor Company. This company was the successor to the company that built the engines involved in this litigation and was the company that had made extensive inspection of the engines after the damage had been incurred and was familiar with the repair needs of the engines. Plaintiff was entitled to have an experienced, well-equipped, expert company repair the engines rather than risk repair at a smaller facility. The Court also finds that the bid quoted by White Motor Company was reasonable. The engines, if repaired by White Motor Company, would have had to go through the assembly line just as new engines would have. The reasonableness of the bid was also testified to by plaintiff's expert McLean.

The cost of reinstallation of the repaired engines would have been $13,500.00. This was the figure bid by Calumet Shipyard & Dry Dock Company, the lowest bidder. This figure is not disputed, and the Court finds that it is reasonable.

The total cost of repairs and reinstallation of the engines is found to be $75,500.00.

### 2. Loss of Use

██ Loss of profits or use of a vessel during repair is a proper element of damage providing the profits can be proven with reasonable certainty. The burden of proof is on the plaintiff to establish the amount of profits lost, and the plaintiff also has the burden of showing that the amount of time expended for repairs was necessary. See The Tanker Hygrade No. 24 v. The Tug Dynamic, 233 F.2d 444 (2d Cir. 1956); Anthony O'Boyle, Inc. v. The Robin Hood, 134 F. Supp. 271 (E.D. N.Y. 1955); Van Camp Sea Food Co. v. Di Leva, 171 F.2d 454 (9th Cir. 1948).

The plaintiff has failed to meet its burden of proof in respect to the amount it claims. The first nine and one-half months, approximately, of the period for which loss of use is claimed were spent basically in ascertaining the extent of damage to the engines and procuring financing for the purchase of the new engines. Plaintiff has made no showing that this amount of time was a reasonable or necessary period of time to accomplish these objectives.

Plaintiff has argued that since the repair of these engines would involve sending them through the assembly line in the same fashion as new engines, the time between the ordering of the new engines and their shipment to the shipyard which would install them is the amount of time required to repair them. The new engines were shipped about eight months after they were ordered. Plaintiff has failed to show that this amount of time was actually required to send the engines through the assembly line.

Plaintiff has failed to carry its burden of proof as to the time required to repair the engines here involved.

Defendant's expert was of the opinion that twenty-five days would be required to repair the engines at a shipyard along the waterways.

The Court has found that plaintiff was entitled to have the engines repaired at a facility experienced and fully equipped to handle this kind of repair, and is of the opinion that a reasonable period of time for the engines to go through the assembly line of such a facility would be two months.

Plaintiff was entitled to make an inspection of the damage to the engines and did cause thorough, detailed inspections to be made. The defendant, at no time, availed itself of the opportunity it had, after receipt of notice of the damage, to appoint a surveyor to represent its interests and cannot now be heard to complain that the inspections were not necessary. The Court is of the opinion that inspections, if made promptly, should have reasonably taken one month.

The new engines were shipped on April 14, 1961 and April 19, 1961, to the shipyard that was to install them. The TAMMY GRANT returned to service May 17, 1961. The Court finds that one month would also be a reasonable amount of time to reinstall repaired engines in the TAMMY GRANT.

■ The charter hire of a vessel under hire is a proper measure of damages for loss of use. See Agwilines, Inc. v. Eagle Oil & Shipping Co., 153 F.2d 869 (2d Cir. 1946), cert. denied 328 U.S. 835.

The charter hire for the TAMMY GRANT was $3,500.00 per month. Defendant argues that, under a proposed option to purchase the vessel, the charterer would have certain amounts of the charter hire credited against the purchase price if the option were exercised. The amounts which would have been so credited, defendant contends, should be deducted from the charter hire in measuring damages. The option to purchase was never executed, and to refer to its terms would inject speculation into the computation of damages.

The Court finds that four months is a reasonable period for loss of use and that the charter hire for that period is $14,000.00.

3. *Out-of-Pocket Expenses*

The following is an itemized list of the out-of-pocket expenses here involved:

(1) Missouri Dry Dock & Repair Company for services rendered to the TAMMY GRANT at Cape Girardeau, August 11, 1961 ..................................... $ 788.63

(2) White Motor Company for inspection at Cape Girardeau, December 30, 1959 ............................. $ 427.10

(3) Charge for towing TAMMY GRANT from Cape Girardeau to South Chicago, May 18, 1960 ................. $ 469.00

(4) Charge for removing engines from TAMMY GRANT and shipping to White Motor Company, October 26, 1960 ... $2,398.32

(5) White Motor Company for inspection at Springfield, October 26, 1960 ............................... $1,484.56

(6) Rechroming crankshaft of starboard engine, December 23, 1959 .................................... $2,920.38

(7) Naval architect's fee for designing new foundations for new engines, August 11, 1961 ....................... $ 756.00

(8) Inspection by plaintiff's expert, February 11, 1960 .. $ 241.40

———◆———

■ The defendant claims that the plaintiff is entitled to only one survey of the damages to the engines and consequently contends that only one of items (2), (5), and (8) should be allowed. Plaintiff responds that items (2) and (5), relating to work done by the White Motor Company, are not properly classi-

fied as surveys but were specialized services requiring specialized equipment. Plaintiff's point is well taken. This work was done by the successor company to the one that built the engines. Plaintiff's conduct was reasonable in getting expert information about the condition of the engines from White Motor Company. The vessel had been operating less than two weeks after being delivered by the defendant. Defendant also failed to avail itself of the opportunity to appoint a surveyor. Under these circumstances defendant cannot complain that plaintiff obtained detailed inspections of the damage. Items (2), (5), and (8) are proper out-of-pocket expenses.

Defendant challenges item (4) on the ground that other shipyards closer to Cape Girardeau could have done the work undertaken by Calumet Shipyard & Dry Dock Company. The testimony as to the reasonableness of the expense stands in the record undisputed. The comments made above relative to defendant's failure to appoint a surveyor are applicable here as well.

Defendant contends that item (7) should not be allowed because the plaintiff is entitled to recover only the cost of repair of the engines, and item (7) relates to foundations for new engines. The evidence in this case clearly demonstrates that the foundations in the TAMMY GRANT were severely distorted. It is apparent that such distortions could be corrected only by a major repair or by installation of new foundations. In either event, services of a naval architect would be reasonable and necessary. The testimony as to the reasonableness of item (7) is undisputed.

Item (6) is challenged by the defendant because the record does not disclose the disposition of the rechromed crankshaft. Therefore, plaintiff either has it or had it, and consequently, allowance of this item would involve a dual recovery.

The Court agrees with defendant's position as to item (6).

Items (1) and (3) are not contested.

Plaintiff is entitled to recover all the out-of-pocket expenses itemized above with the exception of item (6). The total recovery for out-of-pocket expenses is $6,565.01.

### 4. *Interest*

The Court will exercise its discretion to allow plaintiff pre-judgment interest on the damages to which it is entitled at the rate of 5 per cent per annum. The interest on loss of use and engine damage is to run from March 1, 1960. This date is based on the Court's finding that four months from the date of the breakdown of the TAMMY GRANT is a reasonable period for loss of use. Interest on out-of-pocket expenses is to run from the date of payment of such expenses.

### CLAIM OF THE INTERVENING PLAINTIFF

Glens Falls Insurance Company is subrogated to the extent of $38,084.87 to the claim of Midwest by reason of payments made by Glens Falls to Midwest under its policy No. HF–2–1499 which insured against damage to the TAMMY GRANT, resulting from the negligence of repairers. Of the damages recovered herein by Midwest, Glens Falls is entitled to receive the sum of $38,084.87.*

### DEFENDANT'S COUNTERCLAIM

The plaintiff has admitted that the defendant is entitled to recover on its counterclaim in the amount of $60,000.00. Interest on the counterclaim should run from March 1, 1960, the date on which the TAMMY GRANT would have returned to service had repairs been made within a reasonable time. The interest rate is to be 5 per cent per annum.

* Glens Falls Insurance Company made payments to the insureds under policy No. HF–2–1499 in the following amounts on the dates indicated: $24,201.99 on June 13, 1961; $1,484.56 on October 26, 1960; $2,398.32 on October 26, 1960; and $10,000.00 on August 12, 1960.

\* \* \*

The foregoing opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Federal Rules of Civil Procedure.

The plaintiff is entitled to the sum of $96,065.01, together with interest on $89,500.00 of that sum from March 1, 1960, to date of entry of judgment. Interest on the balance of that sum—$6,565.01—representing out-of-pocket expense allowed, is to run from the date of payment of those expenses as set forth in this opinion to date of entry of judgment.

Intervening plaintiff, Glens Falls Insurance Company, is subrogated to the extent of $38,084.87 and is entitled to that sum plus interest from the dates of payment to the date of entry of judgment.

The defendant is entitled to an offset on the counterclaim in the sum of $60,000.00, together with interest from March 1, 1960, to the date of entry of judgment.

The rate of interest shall be 5 per cent per annum in all instances.

The costs and disbursements of the plaintiff and intervening plaintiff herein are to be taxed by the clerk.

The clerk is directed to enter judgment accordingly.