[No. 37790.    Department Two.    September 22, 1966.]

MICHAEL T. VIOEN, *Appellant*, v. R. E. CLUFF, *Respondent.*\*

\*Reported in 418 P.2d 430.

*Benson & Atwell* and *Jerome R. Cronk*, for appellant.

*Lycette, Diamond & Sylvester* and *William J. Millard, Jr.*, for respondent.

DONWORTH, J.—This action was instituted by a 2-year-old boy as plaintiff (by his mother as guardian ad litem) against his host for personal injuries sustained while he and his mother were invited guests in his home.

In the complaint, it was alleged that the host, while the plaintiff was within his residence, "carelessly and negligently caused, permitted, and allowed said minor plaintiff to be injured." The injuries thus sustained were alleged to be severe and permanent. The prayer was for $150,000 general damages and for such special damages as might be proven at the trial.

The host's answer admitted only that he was in possession of the premises referred to in the complaint and "that on the date alleged an incident occurred involving the plaintiff." All other allegations were denied on the ground that the host lacked sufficient information to form a belief as to their truth or falsity. No affirmative defenses were set up in the answer.

The cause was tried before the court, sitting with a jury, solely on the issue of liability. The question of the amount of damages suffered by the minor plaintiff was reserved for a future trial in the event that the host should be found to be liable for the child's injuries.

The only witness who testified at the trial was the child's mother. She testified that, on January 11, 1963, she and her son were invited to respondent's home in Seattle. Previous to this occasion, the mother had been in this home only once for a few minutes at a time when respondent, with a realtor, was inspecting the house as a prospective purchaser. He later did buy the property for his home.

A few days prior to January 11th, respondent telephoned the mother and invited her and her son to come to dinner

on that date for a social evening and to have her son play with his children. Respondent had a 7-year-old daughter, and a son who was 2 months older than the plaintiff.

The mother and her son arrived at respondent's house about 7:45 p.m. He admitted them. At that time, his two children were playing in the living room, which is on the first floor. The mother, who had brought the dessert for the dinner, took it to the kitchen and returned to the living room. As to what then occurred, the mother testified as follows:

Q. After you returned to the living room where Mr. Cluff and the children were, what did you do then? A. Well, Mr. Cluff suggested that the children go upstairs to play, that his children had been up there prior, and their toys were up there. Q. And their toys were up there? A. Yes. Q. What if anything was said further or done at this suggestion? A. Well, I looked up at the steps and I asked him, "Are you sure it is all right for the children to go upstairs?" And he assured me that his daughter would be there and would take care of the children, the seven-year-old daughter. Q. This was while you were standing approximately where? A. It is an entranceway which adjoins a living room. Q. From that position could you see the steps that you are referring to? A. Yes. Q. So when you had this conversation with Mr. Cluff you could see the steps that the children would have used to go upstairs? A. Yes. Q. You knew because you had been there before that those steps led to the upstairs, is that correct? A. Yes. Q. Now, following this conversation with Mr. Cluff what if anything did you do, or what happened? A. Well, I—Mr. Cluff told me that his daughter would be there with the two boys. And I—we went upstairs to the bedroom. They were going to go in a back bedroom. Q. Would you describe the layout as you can recall it of the upstairs after you came to the top of the stairs insofar as you or your child went through it, or was it in that night? A. The stairway enters into the little girl's bedroom, which is right at the top of the steps. Q. Would you describe what was in this bedroom so we have an idea of what you are talking about? A. Just an ordinary bedroom with a bed and a chest of drawers and little girl things in this room. She lived there. Q. It was, as far as you could tell, furnished with normal furniture? A. Yes. Q. Was there a door at the bottom of the stairs? A. No. Q.

Was there a door at the top of the stairs? A. No. Q. Was there a door on the room that this stairway entered into, as you recall it, to the little girl's room? A. I recall no doors. Q. After you and the children went into this first little girl's bedroom, where did you go from there? A. We went through another doorway to the left of this room and went to this back bedroom. Q. To be sure I understand this, did you walk through one room into another room? A. Yes, we did. Q. And was there a door from the little girl's bedroom to this back room that you are talking about? A. I don't recall any at all. Q. What was back in the other room, and what happened there? A. It was a vacant, a small vacant bedroom, and there—the roof is slanted in there, and there is a little storage area which is under this slanted one side of the ceiling, and where apparently there were toys stored. And Mr. Cluff proceeded to bring some toys out for the children. Q. You were present at this time? A. Yes, I was. Q. And did you participate in bringing the toys out? A. No, I didn't bring them out. I recall that there was some dishes for the little girl and—I didn't bring anything out because I didn't know where they were. Q. Now, if I understood your answer, it was no, you did not participate in this at all? A. No. Q. Did Mr. Cluff participate in the activities that you have just described? A. Yes, he brought the toys out for the children. Q. After Mr. Cluff brought the toys out for the children, what if anything did Mr. Cluff do? A. He put his daughter in charge again. He said to her, "You watch the children, and if they want to come downstairs, you call us." Q. This is the girl that you told us was how old? A. Seven. Q. Were you present when he told the daughter—A. Yes, I was. Q. —to watch the children, as you have described it? A. Yes. Q. Did you give the girl any instructions? A. No, I don't recall giving her any. Q. After these instructions were given by Mr. Cluff to his daughter, how long did you stay in the play area? A. We left right away after giving the girl the instructions.

Respondent and the mother then went downstairs to the kitchen for the purpose of cooking dinner.

In her testimony, the mother described the stairs in some detail. During her direct examination, two photographs of the stairway were admitted in evidence without objection. One of them was taken from the second floor looking directly down the stairs to the landing and the other was

taken from the entrance hall on the first floor looking toward the bottom of the stairs where there were three steps below the landing. This picture also shows a side view of the upper portion of the stairs.

As to the accident in which her son (appellant) was hurt, the mother testified:

Q. Now, what happened? You said you went into the kitchen and you hadn't quite gotten ready to fix the dinner until something happened. What happened? A. Well, I don't know whether Mr. Cluff opened the refrigerator or if we even had time for that, but I heard one thud, one main bang. We knew somebody had fallen down the steps. Q. What if anything did you do then? A. We ran from the kitchen to the— Q. About how long after you had arrived at this home did this occur, this thud? A. Twenty minutes, twenty-five minutes. Q. And the children had been upstairs about how long at the time you heard this thud? A. Five minutes, maybe ten. Q. Had any of the children come downstairs at the time you heard this thud? A. No. Q. Had anyone called you from upstairs to tell you the children wanted to come down? A. No. Q. As you left the area, you and Mr. Cluff, going down, did Mr. Cluff close any doors? A. I don't recall any doors at all. Q. Do you know if he put furniture or anything else at the top of the stairs? A. No. Q. Do you know if he put furniture or in any way blocked the first door from the stairs to his little girl's room? A. No. Q. Do you know if he in any way blocked the door from the little girls' room into the play area? A. No, he didn't. Q. Now, after you heard the thud and ran into the living room what did you see? A. Well, I found my son on the floor right near the stairs, at the bottom. Q. Now, showing you again what has been marked for identification as Plaintiff's Exhibit No. 1, as you see, that is the picture that shows the first three steps before you turn the corner; isn't that correct? A. Yes. Q. Can you tell us, by using that picture, roughly where you found your child? A. I don't know the exact location, but his head was toward the steps. His feet were away. Q. How near the steps— Was he on the main floor or was he up on a platform, or where? A. He was on the main floor. Q. That is the main floor that you see in Exhibit No. 1? A. Yes. Q. And now you say his head was near the steps? A. Yes. Q. And would you place his body directly out from the steps as though you were

coming down? A. It was at an angle. Q. An angle between straight out and off to the side, is that correct? A. Yes.

She further testified that, after she and respondent had picked up her son and had calmed him down, they tried to figure out how the child might have received his injury. It was apparent that he had fallen down the stairs in some manner. They tried to ascertain where he must have hit the stairs but they had no way of knowing. The mother examined the back of the child's head and observed a dent with "little red splotchy marks and a red line that ran up and down." She and respondent discussed the cause of this injury and they thought that the child must have struck a step. They then called several doctors and the mother remained at respondent's home "all evening administering my son."

Immediately after the accident, respondent's two children came downstairs. Respondent asked his daughter what she was doing prior to the accident, but the mother did not recall any answer that the daughter gave.

On cross-examination, the mother was asked about her pretrial deposition and answered as follows:

Q. (By Mr. Millard) Do you recall a deposition I took where I asked you about this and you made a remark—page 12—"He again told her to watch the boys and to call us if they came toward the steps at all." A. Yes, I recall. Q. In other words, you thought the little girl who just became seven was to call if either of the little boys came near the stairs? A. I had no reason to believe that she wasn't able to, you know, take care of these two boys. Q. Well, if she called as they came near the stairs, what were you going to do then? A. We were going to go up and get them if they wanted to come down. Q. Did you presume that she would be able to stop both little boys. A. They were in a back bedroom at the time. They weren't right near the top of those steps. We thought that she would call, yes. Q. Now, were you of the opinion at this time that you were delivering the care of your child over to Mr. Cluff or to the seven-year-old child, or did you feel that you had the care yet? What was your feeling about it? A. Well, it was more or less expected, I think, that the children would go upstairs. It was already arranged that the toys were upstairs and that they would

all go up and play because the others had been there before.

We have quoted substantial portions of the mother's testimony relating to respondent's actions and the condition of the stairway at the time of the accident because (with the exception of the two photographs above referred to) there was no other testimony or evidence in the record.

At the conclusion of the plaintiff's evidence, respondent moved to dismiss the case for lack of sufficient evidence to support his claim. After hearing argument on behalf of respondent, the trial court indicated that, because of the uncertainty in this field of law, it was disposed to deny the motion and receive evidence presented by respondent.

Respondent's counsel then announced that respondent would rest and put in no evidence because he saw no reason to do so. He stated to the court that he was renewing his motion to dismiss and resting.

The jury was then excused, and the court and counsel discussed the respective legal positions of the parties and the general character of the jury instructions which the court was about to prepare.

On the following morning the court, having submitted its proposed jury instructions to counsel, entertained their respective exceptions thereto and plaintiff's exceptions to the refusal of the court to give several instructions proposed by his counsel. This procedure was unusually exhaustive and is contained in 35 pages of the statement of facts. (The entire testimony of the mother, who was the sole witness in the case, took up only 28 pages.)

After the court had instructed the jury and counsel had presented their respective arguments, the jury retired and later rendered the following verdict:

INTERROGATORY

Is the defendant liable to the plaintiff for injuries sustained by plaintiff's son?

ANSWER: No.

Thereafter the court, having considered and denied the usual post-trial motions, entered its judgment dismissing

plaintiff's action. From this judgment, this appeal is prosecuted.

Before discussing appellant's seven assignments of error, it should be pointed out that the trial court gave eight instructions to the jury. In order to understand their general impact on the jury, certain instructions should be noticed.

The first instruction informed the jury that:

As you have already learned, the plaintiff in this action seeks to recover a judgment for damages as compensation for personal injuries received by her minor son. As you were also informed by the Court at the beginning of the trial, the only issue which will be submitted to you will be that of liability. Your verdict in this case will be in the form of an answer to a question which you will be directed to answer either "yes" or "no." The question will be, is the defendant liable to the plaintiff?

The first paragraph of the third instruction reads:

The plaintiff is not entitled to a judgment against the defendant solely because plaintiff's son fell and was injured in the defendant's house. If the plaintiff is to recover, she must sustain the burden of proving by a fair preponderance of the evidence that the defendant was negligent in some manner and that such negligence was a proximate cause of the injury which plaintiff's son sustained.

Appellant did not take any exception to the court's referring in these two instructions to the child's mother as the plaintiff. However, he did except to such a reference in instruction No. 4, which advised the jury that:

Under the circumstances of this case, the defendant had a duty to exercise reasonable care in any affirmative action which he took relative to the care and custody of plaintiff's son while in defendant's house. However, the primary duty to look out for and care for her son rested upon the plaintiff.

The question of the correctness of this last instruction will be discussed below.

Another general observation regarding this case is that the issues as defined in the pleadings were limited to the question of negligence. The only allegation in the complaint

relating to respondent's fault was that respondent "carelessly and negligently caused, permitted and allowed the minor plaintiff to be injured." No specific acts of negligence were alleged nor was any willful or wanton misconduct alleged on respondent's part. The case went to trial on respondent's general denial of the above quoted allegation of negligence.

In instruction No. 3, the jury was informed concerning the issue of negligence as follows:

Plaintiff alleges that the defendant was negligent in that he arranged for the plaintiff's son and his son and daughter to play in a bedroom on the second floor of his house with no adult supervision, but instead relied upon his seven-year-old daughter to supervise plaintiff's son, knowing that the stairway to the second floor of his house could be dangerous to a child of the age of plaintiff's son.

The defendant denies any negligence on his part.

. . . . .

"Negligence" is the failure to exercise reasonable and ordinary care, and by the term "reasonable and ordinary care" is meant that degree of care and foresight which an ordinarily careful and prudent person would exercise under the same or similar circumstances or conditions. Negligence may consist in the doing of some act which a reasonably prudent person would not do under the same or similar circumstances, or in the failure to do something which a reasonably prudent person would have done under the same or similar circumstances.

By instruction No. 5, the court defined willful misconduct and wanton misconduct and told the jury that if they found respondent guilty of either one "in the manner in which he maintained his house," he would be responsible for any injury proximately caused thereby.

Appellant's five assignments of error all relate to the giving of certain instructions to the jury and to the trial court's refusal to give certain instructions proposed by appellant. In considering this case, we are limited to a consideration of the matters raised in appellant's exceptions to certain instructions given and refused and included in his assignments of error in this court.

Assignments Nos. 1 and 4 will be discussed together. They

involve instructions and proposed instructions concerning the relative duty of respondent as host and the parental duty of appellant's mother to care for appellant while he was a guest in respondent's home.

In appellant's brief, the respective instructions are set forth with his comments as follows:

The trial court erred:

1. In giving Instruction No. 4 . . . which reads as follows:

"Under the circumstances of this case, the defendant had a duty to exercise reasonable care in any affirmative action which he took relative to the care and custody of plaintiff's son while in defendant's house. However, the primary duty to look out for and care for her son rested upon the plaintiff."

Plaintiff excepted to this instruction for the reason that it referred to plaintiff's mother as the plaintiff, inferring that she personally was seeking redress, and erroneously placed the primary duty of care on her . . . .

. . . .

4. In failing to give plaintiff's second supplemental requested instruction, numbered 1(b) . . . which stated that:

"You are instructed that a minor plaintiff, such as Michael T. Vioen, does not, in law, have imputed to him negligence, if any, on the part of his mother. Therefore, you will totally disregard evidence in this cause, if any, which might point to lack of reasonable care for the minor on the part of his mother, and shall not, in any way, consider any such evidence in determining the rights of Michael T. Vioen."

Plaintiff subsequently offered an alternate proposed instruction adding to the above proposed instruction the following . . . :

"Except that the presence and conduct of the mother may be considered in determining if the negligence of the defendant was the proximate cause of the injuries received by the minor plaintiff."

Both versions of this instruction were rejected by the court and exception was taken . . . .

We agree with appellant that the giving of the trial court's instruction No. 4, when read in connection with the

portions of instructions Nos. 1 and 2 (above quoted), and without any explanation or clarification of the legal relationship between the parental duty of appellant's mother and respondent's duty as host with respect to the child, was prejudicial error. This error was effectively compounded by the form of the verdict submitted to the jury. The jury could have received the erroneous impression from these instructions that, if they found that the appellant's mother had failed to perform her parental duty toward the child, such conduct would supersede or negate the effect of respondent's alleged negligence, even though the latter was a proximate cause of appellant's injury. The jury was not told that any negligence of the mother was not imputable to the child. As applied to the evidence in this case, these instructions were confusing on a vital issue and could have misled the jury.

Appellant has cited several decisions of this court holding that negligence of a parent is not imputable to his child in an action by the child against a third person. The most recent case is *Adamson v. Traylor,* 60 Wn.2d 332, 373 P.2d 961 (1962), in which this court considered a similar instruction and held it to be erroneous even though the instruction given in that case contained two additional precautionary explanations. In that case the trial court, 2 days before the trial, had permitted the answer to be amended to include the defense of contributory negligence of the parent. The plaintiff objected to this amendment and the defendant, at the close of the trial, conceded that the amendment should not have been made and consented to the issue of the father's contributory negligence being withdrawn from the jury's consideration. Holding that it was then too late after all the evidence had been presented to the jury to correct the conceded error, we said, at p. 334-35:

> This is not a case in which an issue is taken from a jury at the conclusion of the evidence by reason of insufficient evidence to support that issue, but is one in which the issue should not have been tried in the first instance, irrespective of the evidence, for the reason that the father in his individual capacity was not a party to the action and, as a matter of law, his negligence could

not be imputed to his minor 8-year-old son. *Gregg v. King Cy.*, 80 Wash. 196, 141 Pac. 340 (1914).

It was too late at the close of the evidence to instruct the jury to disregard the issue of the father's negligence after his responsibility for causing the accident had been injected into the case during the entire course of the trial. The plaintiff was denied a fair trial in being required to try the case with the continued presence before the jury of this improper and highly prejudicial issue to his cause. Moreover, the court did not successfully accomplish its intention to take this issue from the jury. The instruction given, relative to withdrawing the issue of the father's contributory negligence, is in the court's instruction No. 6, to which the plaintiff took appropriate exceptions:

"You are instructed that, under the law of the State of Washington, the primary duty of caring for Kevin Adamson, the minor plaintiff herein, at the time and place in question was that of his father, James M. Adamson.

"However, you are instructed that the negligence, if any, of the father cannot be imputed to the minor plaintiff in this case.

"You are further instructed that under the circumstances that the negligence of the father, if you so find, will not absolve the defendant from liability of any acts of negligence of the defendant."

This instruction does not adequately spell out that the contributory negligence of the father was not in the case and should not have been considered by the jury in determining the defendant's liability. To the contrary, it states the father has a paramount duty to care for the child, which, in view of the prior testimony, raised the inference that this was an issue for determination by the jury. This issue had no place in the case, and we cannot say that the instruction did not have the effect of confusing the jury in its consideration of the issue of contributory negligence.

Respondent seeks to distinguish the *Adamson* case on the theory that the error in that case was based on defendant's affirmatively pleading of the parent's contributory negligence and the injection of that issue into the trial. However, that is not a sufficient distinction to warrant our refusing to apply the rule stated in that case to the facts before us. In the present case, the instruction is much more prejudicial than that given in the *Adamson* case, because *no* precau-

tionary explanations were given. Instruction No. 4 (when read with the other instructions) is totally erroneous and misleading in that it (1) refers to the guardian ad litem as if she were the beneficial plaintiff, and (2) then allows the jury to consider her possible negligence as if it absolved respondent of any legal liability for his possible negligence, even though his negligence may have been a proximate cause of the injuries to the infant plaintiff. Both of these faults were avoided in the *Adamson* instruction, but the case was reversed because the "bell" of error had been rung by the defendant *before* the instruction was given. In the *Adamson* case, *supra,* it is doubtful if any instruction on parental duty should have been given, because the parental duty to care for the boy was not relied on by the defendant in that case (See *Adamson* opinion, 60 Wn.2d 336) and the parental negligence, if any, could not have been the sole proximate cause of the minor plaintiff's injuries.[1] The instruction in *Adamson* just compounded the error and failed to expunge the prejudicial effect caused by amended answer, the evidence and the argument made during the trial.

Appellant's counsel requested clarifying instructions not unlike those given in the *Adamson* case, *supra.* Refusal to give these instructions is the basis for assignment of error

---

[1] Although not stated in our decision, the record in the *Adamson* case shows that the father was not present at the time of the accident. After camping overnight at Long Lake, in the early morning he had asked his two young sons if they wanted to go fishing. They said that they preferred to sleep. The father and his friend then left the boys at the camping area on the lake shore and went fishing. Meanwhile, the younger boy rejected his older brother's suggestion that he sleep in the car and went to sleep in the bedroll. He was later injured in the manner described in our decision. The father and his friend returned from their fishing trip after the accident. From the facts of the case, it is clear that if the father were negligent in allowing the boy to sleep where he was, and this were a failure to perform his primary duty to care for his son, still, his negligence could not have been the sole proximate cause of the boy's injuries because the negligence of the driver of the vehicle which ran over the sleeping boy immediately preceded the the accident. The negligence of the father could not have negated the result which naturally followed from and was directly caused by the driver's negligence.

No. 4. The proposed instruction with the amendment would have read:

> You are instructed that a minor plaintiff, such as Michael T. Vioen, does not, in law, have imputed to him negligence, if any, on the part of his mother. Therefore, you will totally disregard evidence in this cause, if any, which might point to lack of reasonable care for the minor on the part of his mother, and shall not, in any way, consider any such evidence in determining the rights of Michael T. Vioen, except that the presence and conduct of the mother may be considered in determining if the negligence of the defendant was the proximate cause of the injuries received by the minor plaintiff.

Contrast this proposed instruction with instruction No. 4 (above quoted), wherein the court, after telling the jury that respondent had a duty to exercise reasonable care in any *affirmative* action he took relative to the care and custody of *plaintiff's* son, said:

> However, the primary duty to look out for and care for her son rested upon the plaintiff.

The jury could hardly be expected to perceive the difference between contributory negligence of the mother and the failure to fulfill the "primary duty of care" required of a parent, as these negligence concepts affect the question of the liability of the defendant in a case like the one at bar. The "primary duty of care" of a parent must be explained with sufficient clarity so that the jury does not misunderstand it as meaning that the mother's duty is paramount to that of the host and use it as a bar to a finding of liability in the event that they should find that the parent's failure to fulfill her "primary duty of care" is *one* of the proximate causes of the injury, but not the *sole* cause of the injury.

Especially, a minor plaintiff must be protected against this misunderstanding of the jury when, as was done in the present case, the mother is referred to as the beneficial plaintiff 12 times in a total of five of the eight instructions. The prayer of the complaint was for $150,000 general damages for injuries sustained by the child. The jury is not likely to allow a *parent* (whom they are instructed to regard

as the plaintiff) to recover for injuries to her child, even though they find that the defendant is at fault, and his conduct is a proximate cause of the injury, if they also find that the parent's failure to perform her primary duty to look out for and care for her son is a partial proximate cause of the injury.

The jury should be instructed in this case that the parent cannot directly benefit financially from the suit and cannot have any financial interest in any judgment recovered by her son. Such a judgment would be solely the property of the child.

The jury also should have been told in clear language that, if they found that the defendant negligently caused the injury to the minor plaintiff, the fact that the parent's failure to look out for and care for her son may also have contributed to the proximate cause of the injury is irrelevant, and that recovery is not to be denied the minor plaintiff because of such negligence of the parent.

Appellant has also cited the case of *Shay v. Parkhurst,* 38 Wn.2d 341, 229 P.2d 510 (1951), and contends that it is in point. In that case, the custodian of the minor child, acting in loco parentis, had told her to sit on the seat of the taxicab but permitted her to remain standing because the taxi driver assured the custodian that there could be no danger to the minor child if she continued to stand while the cab was in motion, because the doors were locked. Thereafter, as the taxi was turning a corner, a door swung open and the child was thrown out onto the pavement. In the present case, the mother testified that she had at first refused to let her son go upstairs to play but that, after respondent assured her that his daughter could and would care for their respective sons, she allowed her son to play upstairs because of the host's assurance that there was no real danger to her son. On the limited point of the applicability of the doctrine of a parent's "primary duty of care" the *Shay* case has similarity and application.

However, we wish to make it clear that the *Shay* case involved a common carrier (whose duty of care is greater than that of a host to an invited guest), an issue of res ipsa

loquitur (which is not in this case), and a jury verdict favorable to the minor plaintiff. To the extent that these differences affected the result in that case, the opinion is not applicable to the trial record before us. Since we are granting a new trial in this case (which may conceivably involve different evidence and issues), the extent to which the doctrine of the *Shay* case may be applicable is a problem for the litigants and the trial court to consider in the light of such evidence and issues as may be presented when the case is retried.

Appellant's assignments of error Nos. 2 and 3 challenge the giving of the trial court's instructions Nos. 5 and 7. These instructions read:

> The defendant was not unconditionally responsible for the safety of plaintiff's minor son while he was a guest in the defendant's home. If, however, he was guilty of willful or wanton misconduct in the manner in which he maintained his house, he would be responsible for any injury proximately caused by the condition of the house.
>
> The term "willful" means in law the same as it means in everyday usage, that is, a conscious intent to do something. The term "wanton" means more than negligence, as I have defined that term for you. One who acts wantonly acts with a reckless disregard and indifference to the consequences and under such surrounding circumstances that a reasonable man would know that such conduct would in a high degree of probability result in injury to another. (Instruction No. 5)
>
> If you find from a fair preponderance of the evidence that the defendant acted negligently or that he was chargeable with willful or wanton conduct in the manner in which he maintained his house and that such negligence or such willful or wanton misconduct was a proximate cause of injury to the plaintiff's son, your answer to the interrogatory will be "Yes."
>
> If you find from a fair preponderance of the evidence that the defendant did not act negligently, if you find that the defendant was not chargeable with willful or wanton misconduct in the manner in which he maintained his house, or if you find that he was so negligent or was so chargeable with willful or wanton misconduct but that neither such negligence nor such misconduct was a proxi-

mate cause of the injury to plaintiff's son, your answer to the interrogatory will be "No." (Instruction No. 7)

Appellant argues that these instructions are erroneous and prejudicial in several respects. We do not agree with several parts of appellant's argument. However, with two points we do agree.

■ First, the instructions were erroneous in that they state the duty of respondent to act as a reasonably prudent man with regard to appellant's safety only in terms of allowing the jury to consider whether respondent was negligent *if* he acted affirmatively, whereas the jury should also have been told that respondent had a duty to act as a reasonably prudent man would act under these circumstances, and that acting or failing to act as a reasonably prudent man is negligence.

■ Second, the instructions misled the jury into a consideration of whether respondent had fulfilled his duty as a landowner to maintain his premises with regard to the safety of a social guest, whereas the only issue is whether respondent acted as a reasonably prudent man under the circumstances—neither the pleadings nor the evidence nor the theory of appellant involved a willful or wanton failure by respondent to properly maintain his stairway or any other portion of his premises.

With regard to the first point, the instructions quoted above entirely omit any indication that respondent in this case may have had any responsibility to act as a reasonably prudent person in order to protect the 2-year-old appellant, even though respondent (1) had reason to know that the boy would be endangered by the stairway because of appellant's mother's statement to him, and (2) even though respondent had told appellant's mother that the boy's safety would not be jeopardized by this specific danger because respondent's 7-year-old daughter could and would watch both appellant and his own son. The instructions given by the trial court require the jury to find respondent liable *only* for his failure to properly perform an affirmative act, if he attempted to act. The instructions directly and expressly told the jury, in effect, that, if it should find that

respondent omitted to do some act which a reasonably prudent man would have performed under the circumstances, then he is not liable. This is clearly error.

Secondly, the jury was instructed:

If however, he [the host] was guilty of willful or wanton misconduct in the manner in which he maintained his house, he would be responsible for any injury proximately caused by the condition of the house.

This instruction and all other instructions pertaining to willful or wanton misconduct by respondent were irrelevant to the case and misleading to the jury.

As we noted above, this issue was not in the pleadings nor was it raised by the evidence.

The trial court correctly defined the terms "willful" and "wanton." See *Adkisson v. Seattle,* 42 Wn.2d 676, 258 P.2d 461 (1953).

Willful and wanton misconduct has been distinguished from negligence by a long line of modern cases which adopt the *Adkisson* definition that "willful" refers to an intentional behavior, and "wanton" refers to behavior in reckless disregard of the consequences pertaining to the safety of others. See *Benson v. South Kitsap School Dist.,* 63 Wn.2d 192, 386 P.2d 137 (1963); *McGarvey v. Seattle,* 62 Wn.2d 524, 384 P.2d 127 (1963); *Enyeart v. Borgeson,* 60 Wn.2d 494, 374 P.2d 543 (1962); *Hanson v. Freigang,* 55 Wn.2d 70, 345 P.2d 1109 (1959); *Greetan v. Solomon,* 47 Wn.2d 354, 287 P.2d 721 (1955).

The trial court correctly instructed the jury concerning respondent's duty as a host-landowner to a social guest with regard to the condition of his premises. See *Benson v. South Kitsap School Dist., supra; Hanson v. Freigang; supra; Greetan v. Solomon, supra.*

But appellant's complaint does not claim, and appellant's proof does not show, that the stairway was improperly constructed or maintained. The fulfillment of respondent's duty as a landowner to maintain his house properly was not an issue in the case. To instruct the jury on this point could only mislead the jury into believing that appellant had asserted this additional possible theory of recovery

when, in fact, he had alleged and tendered only the issue of whether respondent's negligence in failing to fulfill a duty which respondent may have assumed under the circumstances presented by the evidence in the record was a proximate cause of appellant's injuries.

Normally, presenting an irrelevant issue might not be prejudicial—but here the jury was instructed, in effect, that the only positive duty to act which respondent owed appellant was his duty as a landowner to properly maintain his premises. Thus the jury was invited to apply the "willful or wanton misconduct" test to any failure of respondent to fulfill any duty he may have had because of the surrounding circumstances. This confusion is the vice and prejudice caused by this irrelevant portion of instruction No. 7 quoted above.

Both parties rely on *Potts v. Amis,* 62 Wn.2d 777, 384 P.2d 825 (1963), and have discussed it extensively. We think both parties have read far too much into the opinion of that case. Each tort case depends on its own facts. Whether a man has a duty to act or is liable only *if* he acts, but acts negligently, depends on the circumstances in which he finds himself. We think *Potts v. Amis, supra,* involves a substantially different set of circumstances from those in the case before us.

We have also considered appellant's assignment of error No. 5, which charges that the trial court erred in refusing to give appellant's proposed instructions Nos. 4 and 9, which would have instructed the jury, in effect, that respondent, as host and landowner, had a duty to exercise reasonable care to protect small children from his stairway. This assignment is clearly without merit. The proposed instructions, if given, would have been erroneous in two respects — (1) they misstate respondent's duty arising from his position as host-landowner, and (2) they might have been a comment on the evidence, *i.e.* in assuming the alleged dangerous character of the stairway, which is only a factual question at most in this case.

For the errors noted above, the judgment of dismissal must be reversed and the cause remanded for a new trial.

Accordingly, the judgment of dismissal is hereby reversed and the case remanded for a new trial to be conducted consistently with this opinion. Costs of this appeal will abide the result of the new trial as provided in Rule on Appeal 55(b)(1).

ROSELLINI, C. J., WEAVER, J., and LANGENBACH, J. Pro Tem., concur.

FINLEY, J. (concurring in part and dissenting in part)—I have been concerned for sometime that some of the reasoning in our decisions has been both confusing and somewhat inconsistent in indicating that the negligence of a parent is not to be imputed to a minor child; but the negligence of a parent may be evaluated along with the alleged negligence or blameworthiness of a defendant in terms of proximate cause on the part of either or both; *i.e.*, whether the negligence of one or the other was "the proximate cause" of the injury. Thus, in the indicated frame of reference, the majority opinion states:

> The jury could hardly be expected to perceive the difference between contributory negligence of the mother and the failure to fulfill the "primary duty of care" required of a parent, as these negligence concepts affect the question of the liability of the defendant in a case like the one at bar. The "primary duty of care" of a parent must be explained with sufficient clarity so that the jury does not misunderstand it as meaning that the mother's duty is paramount to that of the host and use it as a bar to a finding of liability in the event that they should find that the parent's failure to fulfill her "primary duty of care" is *one* of the proximate causes of the injury, but not the *sole* cause of the injury.

It seems to me it would not only be difficult for the jury to distinguish between (a) parental negligence and (b) parental failure to fulfill a primary duty of care as to a minor offspring, but that any such attempted distinction is unrealistic—in fact, fictional—except for the language of the law and the nomenclature of judicial decision. There is no real distinction between the two things. The confusion is further compounded by decisional language adverted to by

the majority to the effect that the parent cannot directly benefit financially from the suit, and cannot have any financial interest in any judgment recovered by her son. In such cases a minor has certain interests. Parents also have certain interests. In some respects these interests are separate, but in other respects they overlap or they are dual in nature. Medical, hospitalization, physical therapy, and other costs for physical and mental rehabilitation of the injured child, certainly as a practical matter, occasion a parent considerable interest of an inescapable **financial** nature.

Absent comment that a parent can in effect have no financial interest in the litigation; and absent comment as to contributory negligence of the mother, or imputation of her negligence as to the claim of the minor child, the reasoning of the majority opinion regarding the legal concept of proximate causation could provide a reasonably effective and operative mechanism for the jury to determine whether it should impose liability against the defendant. Instructions along this line, in my judgment, would constitute—in part at least—a fairly realistic and rational evaluation of the interest of the minor and the parent and the defendant in the instant case. If this is not the law, I think it should be.

I agree with the views of the majority as to appellant's error assigned regarding instructions Nos. 5 and 7. For the reasons and to the extent indicated, I concur in part and dissent in part.