[No. 43881. En Banc. October 28, 1976.]

LOREN BERG, *Petitioner*, v. GENERAL MOTORS CORPORATION, *Respondent*.

*Anthony Schwab,* for petitioner.

*Perkins, Coie, Stone, Olsen & Williams,* by *J. Paul Coie, William A. Gould,* and *Steven C. Marshall (Frazer F. Hilder* and *Thomas W. Watkins,* of counsel), for respondent.

*William L. Dwyer, John J. Dystel,* and *Richard Yarmuth,* amici curiae.

WRIGHT, J.—This appeal involves the single issue of whether the law of negligence permits recovery by a purchaser of goods against a manufacturer for damages constituting solely economic loss as distinguished from damage to person or property.

Appellant is a commercial fisherman. In 1970 he purchased from Duncan Engine Company (Duncan) a new Detroit Diesel (made by General Motors Corporation, Detroit Diesel Division (General Motors)) for his new boat. The engine was listed as an 8V-53N and came fitted from the factory with what is called an MG-506 clutch. The clutch, according to the manufacturer, was not of sturdy enough design to withstand the stresses imposed by an 8V-53N engine, if such engine were engaged in commercial use.

While in Alaska on a fishing trip, appellant's engine broke down after approximately 600 hours of operation. The cause was traced to an error in factory assembly. The engine was rebuilt by Duncan without advance notice to respondent-General Motors. Respondent was eventually notified by Duncan of the engine rebuild, and paid the entire cost thereof.

Appellant resumed fishing. But on August 14, 1971, the rebuilt engine disintegrated, with 40 hours of total running time on it. Duncan sent its mechanic with a new engine (model 8V-53N) and installed it in the vessel; the costs were paid by respondent. This second breakdown was caused by a failure of a cap screw that held down the cam roller. The cam roller came loose and punched a hole in the block. Whether that problem was caused by a faulty part

(General Motor's responsibility) or faulty mechanic workmanship (Duncan's responsibility) is not known. The damaged parts were not saved although appellant demanded they be kept. Defendant asserted that it was customary to throw out the parts from both the first and second breakdown, even though they knew a claim was being asserted involving those parts.

A third failure in the drivetrain occurred when the clutch failed. The MG-506 clutch was rated for 160 horsepower engine use; the 8V-53N developed 283 horsepower. In a Detroit Diesel brochure appellant had received at Duncan, appellant was urged to rely on Duncan to make the selection of the appropriate engine:

> For complete engine specifications for your particular application see your authorized Detroit Diesel representative.

Respondent made no effort to inform its dealers of the limitation of the MG-506 clutch for use with the 8V-53N engine.

The above-mentioned breakdowns occurred during the 1971 fishing season. Appellant filed suit against Duncan and Detroit Diesel for damages in part based on anticipated value of the fish catch that predictably could have been taken during the period that appellant's boat was laid up for repairs. The action against General Motors was based on two theories: (1) negligent manufacture, and (2) vicarious liability based upon agency for the negligence of Duncan and for breach of an implied warranty of fitness.

At the opening of the trial, defendant-Detroit Diesel moved for summary judgment for failure to state a cause of action. The Superior Court, considering only the liability issues and not the damages issue, allowed an offer of proof and then dismissed the case against the manufacturer, Detroit Diesel, on three bases: (1) There was no privity between the manufacturer and the retail consumer and no basis upon warranties for recovery because privity was required; (2) there was no agency in fact, apparent, or in law, connecting the manufacturer and the retail dealer for

the limited agency of sales and repairs made in connection with the sale; and (3) the negligence of the manufacturer directly in failing to inform its dealers of known facts (clutch use prohibitions) and in failing to use due care in repairing and/or manufacturing its product will not support a recovery of pecuniary losses in damages for lost fishing production and/or diminution in value of a fishing vessel.

Plaintiff Berg appealed the summary judgment. The Court of Appeals affirmed. Appellant thereafter petitioned this court for review, which was granted. The issue of agency, however, was eliminated. Berg's action against Duncan continued pending the outcome of this appeal. The issue for our determination will be whether the trial court erred in failing to recognize the cause of action for economic loss.

When products liability cases are based on negligence or strict liability, some jurisdictions have held that pecuniary loss alone is not recoverable. There are two often-cited rationales for this result. First, it is said the manufacturer cannot be regarded as having assumed responsibility for more than the safety of the product. Absent some special circumstance, (e.g., express warranty or innocent misrepresentation), the manufacturer does not assume responsibility for the commercial viability or economic performance of the item sold—at least to a remote purchaser or user. Between the immediate vendor and vendee, the limits of liability for poorly performing products is defined by the "basis of the bargain." This basis of the bargain can find expression only in actual representations or implied warranties between immediate sellers and buyers. "Damages for inferior quality, per se, should be left to suits between vendors and purchasers since they depend on the terms of the bargain between them." *Trans World Airlines, Inc. v. Curtiss-Wright Corp.*, 1 Misc. 2d 477, 148 N.Y.S.2d 284 (1955). In *Seely v. White Motor Co.*, 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965), Justice Traynor established the pattern followed by many courts in suits where only

lost profits were pleaded as damages and a theory other than warranty or misrepresentation was the remedy for recovery. Justice Traynor stated at page 18:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. *Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.*

(Italics ours.)

The second rationale for denying lost-profit damages in nonwarranty actions is the belief that a malfunctioning product, generating solely a loss of income, violates only a contractual expectation. Only toward the injured person, or owner of injured property, is there liability in tort. In *Trans World Airlines, Inc. v. Curtiss-Wright Corp., supra,* it was held that latent defects in aircraft engines, which caused injury only to the engines themselves, were not actionable in negligence. The matter was stated thus in *Trans World* at pages 481-82:

> Until there is an accident, there can be no loss arising from breach of this duty, i.e., as a result of negligence (as distinguished from warranty). "Though negligence may endanger the person or property of another, no actionable wrong is committed if the danger is averted."

(Schmidt v. Merchants Desp. Transp. Co., 270 N. Y. 287, 300.)

The damage asserted by T W A is for replacement cost of allegedly inferior engines—a matter of qualitative inadequacy in a product purchased from Lockheed, a proper subject for a claim of breach of warranty, pure and simple. It is true that when the engines "failed to operate", the planes became "imminently dangerous"; but the danger was "averted". There was no accident. The malfunctioning of the engines had not yet turned into a misadventure.

T W A was not without remedy. Until an accident attributable to a defective engine happened, its only remedy was to hold Lockheed, the seller, for breach of warranty. It is only when the danger inherent in a defectively made article causes an accident that a cause of action against the manufacturer also arises.

If the ultimate user were allowed to sue the manufacturer in negligence merely because an article with latent defects turned out to be bad when used in "regular service" without any accident occurring, there would be nothing left of the citadel of privity and not much scope for the law of warranty. There seems to me to be good reason for maintaining that, short of an accident, the citadel should be preserved. Manufacturers would be subject to indiscriminate lawsuits by persons having no contractual relations with them, persons who could thereby escape the limitations, if any, agreed upon in their contract of purchase. Damages for inferior quality, per se, should better be left to suits between vendors and purchasers since they depend on the terms of the bargain between them.

The case of *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305, 16 A.L.R.3d 670 (1965), departed from the rule that a commercially worthless product could not be the subject of a lawsuit against a manufacturer with which there was no privity of contract. The rationale for modifying that rule was based on avoidance of circuity of litigation where the same result (*i.e.,* manufacturer's liability) would be reached. The court in *Santor* justified its decision with the following analysis at page 62:

It has been suggested that the public urgency for the rule permitting the manufacturer to be sued by an in-

jured consumer regardless of privity of contract does not exist where the only damage sustained by him is loss of the defective article. The argument is that liability for the latter damage should be restricted to the immediate seller, and that the age-old privity doctrine should continue to bar direct recourse to the manufacturer. And it is said the dealer always has his action over against the maker of the defective product. In *Randy Knitwear, supra* [*Randy Knitwear, Inc. v. American Cyanamid Co.,* 11 N.Y. 2d 5, 181 N.E. 2d 399, 226 N.Y.S.2d 363 (1962)], Judge Fuld dealt with the same problem. He said:

"It is true that in many cases the manufacturer will ultimately be held accountable for the falsity of his representations, but only after an unduly wasteful process of litigation. Thus, if the consumer or ultimate business user sues and recovers, for breach of warranty, from his immediate seller and if the latter, in turn, sues and recovers against his supplier in recoupment of his damages and costs, eventually, after several separate actions by those in the chain of distribution, the manufacturer may finally be obliged 'to shoulder the responsibility which should have been his in the first instance.' (Hamon v. Digliani, 148 Conn. 710, 717, 174 A. 2d 294, 297; see Kasler & Cohen v. Slavouski [1928], 1 K.B. 78, where there was a series of 5 recoveries, the manufacturer ultimately paying the consumer's damages, plus a much larger sum covering the costs of the entire litigation.) As is manifest, and as Dean Prosser observes, this circuity of action is 'an expensive, time consuming and wasteful process, and it may be interrupted by insolvency, lack of jurisdiction, disclaimers, or the statute of limitations.' (Prosser, The Assault upon the Citadel [Strict Liability to the Consumer], 69 Yale L. J. 1099, 1124.)" 226 *N. Y. S. 2d,* at *p.* 368, 181 N.E.2d, at *p.* 403.

We agree pursuit of this wasteful and frequently inadequate process should not be required . . .

The development of our own case law upon this subject has been somewhat confusing. Statements in at least two cases suggest that the loss of profits, without any other type of damage, is actionable without privity. *Wise v. Hayes,* 58 Wn.2d 106, 361 P.2d 171 (1961); *Nakanishi v. Foster,* 64 Wn.2d 647, 393 P.2d 635 (1964). In *Wise* the court stated at page 109:

(2) The rule that, if there is no contractual privity, there can be no warranty, has three exceptions: (1) Where the article causing the injury is of a noxious or dangerous nature, (2) where fraud or deceit has been shown on the part of the offending party, or (3) where the manufacturer has been negligent in some respect with reference to the sale or construction of an item not imminently dangerous. *Dimoff v. Ernie Majer, Inc.*, 55 Wn. (2d) 385, 389, 347 P. (2d) 1056 (1960).

In *Nakanishi*, the court stated at page 658:

Some confusion may have arisen because of the necessity to discuss breach of warranty, breach of contract, and negligence in deciding some cases. We prefer to base our decision in this case on the broader ground that a manufacturer or processor who offers goods on the market to remote users must use reasonable care where there is a foreseeable risk of harm to the consumer if reasonable care is not used.

Rohnert's contention that the manufacturer or processor must answer only for consequential injury to person or destruction of property is not sound in the light of the decisions in *Freeman v. Navarre, supra* [47 Wn.2d 760, 289 P.2d 1015 (1955)], involving cost of repair of a heating and ventilating system, and *Wise v. Hayes, supra*, involving damage for loss of crop.

The opinion of the Court of Appeals, *Berg v. General Motors Corp.*, 13 Wn. App. 326, 534 P.2d 838 (1975), contains a summary of relevant cases of this jurisdiction and undertakes to demonstrate how none of those cases clearly enunciates the principle of law urged by the appellant. The cases are difficult to reconcile and for purposes of simplicity, we will treat the issue as one of first impression.

■ Is there any compelling reason why, under a negligence theory of recovery, lost profits, standing alone (assuming that causation and breach of duty can be shown), would not constitute a prima facie case against a remote manufacturer? We find no compelling reasons for denying lost profits, per se, in negligence actions, whether against immediate or remote sellers. The rationale appearing in the cases contra do not persuade us. We discern four reasons for reversing the Court of Appeals. First, we do not see any

increased hazard of a manufacturer being subjected to indiscriminate lawsuits where a plaintiff is permitted to recover lost profits against that remote manufacturer. Under warranty liability, the manufacturer eventually is obliged " 'to shoulder the responsibility which should have been his in the first instance.' " *Santor v. A & M Karagheusian, Inc.*, *supra* at 62. Negligence actions usually avoid multiple suits. Second, we are not convinced of the accuracy of the statement made in *Curtiss-Wright* at page 482, that:

> It is only when the danger inherent in a defectively made article causes an accident that a cause of action against the manufacturer also arises.

A distinction that would allow recovery if the product in question destroyed the property of another, yet would deny recovery were the same product merely to disintegrate, is a specious one. The proper functioning of equipment owned by a plaintiff, from which that person plans to derive income is of great concern to him. To suggest that a breakdown in production is not serious is naive. *See* Restatement of Torts §§ 901, 906, 928, 931 (1939). Third, we do not agree with the suggestion that unless the manufacturer knows and "consents" to the use being made of its product, it would be unfair to charge such manufacturer with commercially poor performance. "Foreseeability" and a duty to the complaining party must be proved. *LaPlante v. State*, 85 Wn.2d 154, 531 P.2d 299 (1975); *Burton v. Douglas County*, 14 Wn. App. 151, 539 P.2d 97 (1975). The scope of the duty owed is measured by the foreseeability of the risk, and whether the danger created by that risk is sufficiently large to embrace the specific harm alleged to have occurred. *Rose v. Nevitt*, 56 Wn.2d 882, 355 P.2d 776 (1960); *Vioen v. Cluff*, 69 Wn.2d 306, 418 P.2d 430 (1966); *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928); Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1 (1953). A manufacturer intending and foreseeing that its product would eventually be purchased by persons operating commercial ventures, owes such persons the duty not to impair that purchaser's commercial operations by a faulty

product. The negligent manufacture of such an article sold, poses the foreseeable risk that the output of the entire enterprise would be diminished or even temporarily halted. The specie of harm generated by such work stoppage (lost profits) is well within the zone of danger created and foreseen by the negligent act. We believe that the facts in this case give rise to a prima facie case in negligence, sufficient to withstand a challenge by summary judgment. *Nakanishi v. Foster, supra; Freeman v. Navarre*, 47 Wn.2d 760, 289 P.2d 1015 (1955); *Wise v. Hayes, supra; Reefer Queen Co. v. Marine Constr. & Design Co.*, 73 Wn.2d 774, 440 P.2d 448 (1968). As to the issue of damages, the summary judgment in this case was based on the theory that lost profits, per se, could not constitute a compensable harm in a negligence action against a remote manufacturer. This brings us to the fourth reason why we have decided to adopt a contrary rule. Viewed from a historical perspective, we conclude that no substantive basis exists for denying lost profits against the remote manufacturer, at least in negligence. The only basis for such a rule exists in the historical development of products liability law, which at an early date relied on implied contract to sidestep the very burdensome proof required to charge a remote manufacturer in negligence. Courts are anxious to find some legal theory sufficient to protect the public interest. Implied warranty was the convenient legal device selected to accomplish this purpose. However, this theory has frequently suffered the stricture of "privity". *Baxter v. Ford Motor Co.*, 168 Wash. 456, 12 P.2d 409 (1932); *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960); *Stonebrink v. Highland Motors, Inc.*, 171 Ore. 415, 137 P.2d 986 (1943); *Wells v. Oldsmobile Co.*, 147 Ore. 687, 35 P.2d 232 (1934); *Ryan v. Progressive Grocery Stores, Inc.*, 255 N.Y. 388, 175 N.E. 105, 74 A.L.R. 339 (1931); *Frank R. Jelleff, Inc. v. Braden*, 233 F.2d 671, 63 A.L.R.2d 400 (D.C. Cir. 1956). Eventually, these two theories contributed to the formation of a third theory of recovery, which has elements of contract and of tort, *i.e.*, strict liability. *Randy Knitwear,*

*Inc. v. American Cyanamid Co.*, 11 N.Y.2d 5, 181 N.E.2d 399, 226 N.Y.S.2d 363 (1962); *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 377 P.2d 897, 27 Cal. Rptr. 697 (1962); *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965); Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099 (1960); Kessler, *The Protection of the Consumer Under Modern Sales Law, Part 1*, 74 Yale L.J. 262 (1964). Each theory has a historical basis and should have its identity kept intact. "Privity" as a limitation, only inheres in warranty. "Foreseeability" as a limitation, only inheres in negligence. "Personal or property damage" as a limitation only inheres in strict liability. We conclude that there is nothing in the tort of negligence which prevents lost profits from being a specie of recompensable harm which is actionable against the remote manufacturer.

The rule we have adopted today is by no means new, and in the area of maritime litigation, such rule has long existed with no distinction being made as to the nature of the damages, or whether the injury is alleged to be tort or contract. *The Conqueror*, 166 U.S. 110, 41 L. Ed. 937, 17 S. Ct. 510 (1896); *The "Potomac"*, 105 U.S. 630, 26 L. Ed. 1194 (1881); *Williamson v. Barrett*, 54 U.S. (13 How.) 101, 14 L. Ed. 68 (1851); *United States v. Laflin*, 24 F.2d 683 (9th Cir. 1928); *Casado v. Schooner Pilgrim, Inc.*, 171 F. Supp. 78 (D. Mass. 1959); *Carbone v. Ursich*, 209 F.2d 178 (9th Cir. 1953), *overruling, Borcich v. Ancich*, 191 F.2d 392 (9th Cir. 1951), *cert. denied*, 342 U.S. 905, 96 L. Ed. 677, 72 S. Ct. 293, *rehearing denied*, 342 U.S. 934, 96 L. Ed. 695, 72 S. Ct. 374 (1952); *Reefer Queen Co. v. Marine Constr. & Design Co.*, *supra*; *Kadiak Fisheries Co. v. Murphy Diesel Co.*, 70 Wn.2d 153, 422 P.2d 496 (1967); *Arnesen v. Rowe*, 46 Wn.2d 718, 284 P.2d 329 (1955).

In maritime cases, whenever a vessel is wrongfully detained in its normal commerce, the owner is entitled, as damages, to income lost. For example, in the case of *The "Potomac"*, *supra*, two steamboats collided, causing each boat to be dry-docked for repairs. Action was filed in the district court by the owner of one of the steamboats (*The

*Robert E. Lee*) against the vessel *Potomac* and its owners. In determining the acceptable measure for the loss of use, the court stated at page 631:

> In order to make full compensation and indemnity for what has been lost by the collision, *restitutio in integrum,* the owners of the injured vessel are entitled to recover for the loss of her use, while laid up for repairs. When there is a market price for such use, that price is the test of the sum to be recovered. When there is no market price, evidence of the profits that she would have earned if not disabled is competent; but from the gross freight must be deducted so much as would in ordinary cases be disbursed on account of her expenses in earning it; in no event can more than the net profits be recovered by way of damages; and the burden is upon the libellant to prove the extent of the damages actually sustained by him.

(Citations omitted.) In *Williamson v. Barrett, supra,* another collision case, it was held that loss of use, as a specie of damage, was absolutely necessary for just compensation, it being stated at page 110:

> That an allowance short of some compensation for this loss [of use] would fail to be an indemnity for the injury is apparent.

The court in *Williamson* observed that the injured vessel, at the time of collision, was hauling freight, so that the money the ship would have earned had the haul been completed, became the measure of damages. The court stated at page 110:

> The principle, however, governing the court in adopting the freight which the vessel was in the act of earning, as a just measure of compensation in the case, is one of general application. It looks to the capacity of the vessel to earn freight, for the benefit of the owner, and consequent loss sustained while deprived of her service. In other words, to the amount she would earn him on hire.

In accord is the case of *Midwest Marine, Inc. v. Sturgeon Bay Shipbuilding & Dry Dock Co.,* 247 F. Supp. 283 (E.D.

Wis. 1965), which, in granting $14,000 for loss of charter, stated at page 290:

Loss of profits or use of a vessel during repair is a proper element of damage providing the profits can be proven with reasonable certainty. The burden of proof is on the plaintiff to establish the amount of profits lost, and the plaintiff also has the burden of showing that the amount of time expended for repairs was necessary. See The Tanker Hygrade No. 24 v. The Tug Dynamic, 233 F.2d 444 (2d Cir. 1956); Anthony O'Boyle, Inc. v. The Robin Hood, 134 F. Supp. 271 (E.D.N.Y. 1955); Van Camp Sea Food Co. v. Di Leva, 171 F.2d 454 (9th Cir. 1948).

■ In the case of fishing vessels, where the detention occurs either at the preparation stage of a fishing run, or actually during such run itself, courts are willing to grant damages for loss of use. *Taber v. Jenny*, 23 F. Cas. 605 (No. 13,720) (D. Mass. 1856); *United States v. Laflin*, 24 F.2d 683 (9th Cir. 1928); *Casado v. Schooner Pilgrim, Inc., supra; Reefer Queen Co. v. Marine Constr. & Design Co., supra; Kadiak Fisheries Co. v. Murphy Diesel Co., Inc., supra; Arnesen v. Rowe, supra; Carbone v. Ursich, supra.*

Recovery in such instances depends on several factors, such as which fishing industry, which waters, skill and experience of captain and crew, the boat's equipment, weather conditions during the time of detention, success during pre- and post-detention fishing runs, and success of other similarly equipped vessels during the period of detention in those same waters. *Carbone v. Ursich, supra; Van Camp Sea Food Co., Inc. v. Di Leva*, 171 F.2d 454 (9th Cir. 1948); *United States v. Laflin, supra; Reefer Queen Co. v. Marine Constr. & Design Co., supra; Kadiak Fisheries Co. v. Murphy Diesel Co., supra.*

In *Carbone v. Ursich, supra,* the owner of a vessel was allowed as damages, the estimated value of sardines that could have been caught by plaintiff's vessel had it otherwise been possible to remain at the fishing grounds, instead of having to leave in order to repair some of the vessel's running gear. Plaintiff's vessel, *Western Pride,* was fishing

off of Los Angeles Harbor for sardines. While the net was in the water with a catch in it, it was fouled by another fishing boat, damaging the net and causing a loss of the fish. Four days were required to repair the net. At trial, the owner estimated the tonnage of fish that could have been brought aboard during the 4-day period. The trial court held that the evidence was sufficient to accurately reflect the damages caused by loss of use.

In *Reefer Queen Co. v. Marine Constr. & Design Co.*, 73 Wn.2d 774, 440 P.2d 448 (1968), the breakdown of a purse seine winch, caused by the failure of defendant to case harden winch shafts, was the basis for sustaining the award of $60,750, based on a loss of 11 days of tuna fishing time. There was evidence as to the number of fish caught immediately prior to the first breakdown, and evidence that *Reefer Queen* was in a school of tuna at the time of breakdown. Log entries of other vessels engaged in catching fish during the 11-day period were supplied. Of interest to the instant appeal was the decision in *Reefer Queen* to charge the subcontractor with liability even though there was no contractual undertaking or sale between plaintiff and the defendant shaft supplier.[1] No discussion was made as to the problem of lost profit damages in nonwarranty actions, although the court appeared to have *sub silentio* ruled on the issue in *Reefer Queen* at pages 778, 781-82.

For the above reasons, we hold the summary judgment dismissing the negligence cause of action against General Motors is vacated.

ROSELLINI, HUNTER, HAMILTON, UTTER, BRACHTENBACH, and HOROWITZ, JJ., and RUMMEL and HENRY, JJ. Pro Tem., concur.

Petition for rehearing denied February 8, 1977.

---

[1]Defendant did not actually sell the general contractor the three winch shafts, but rather, only prepared the shafts for winch use by grinding and case hardening those shafts. However, the case cannot be distinguished on this basis from the issue in this appeal.